## CHICAGO PORTRAIT CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Seventh Circuit. December 23, 1924. Rehearing Denied March 2, 1925.)

### No. 3276.

**Trade-marks and trade-names and unfair competition ☞78—Method of selling portraits held not such as to authorize a desist order by the trade commission.**

Sales talks of solicitors for a portrait company engaged in making and selling family portraits to customers, whereby, by means of false statements as to the customary price charged and by drawings in which the customer receives a trade check applicable in payment of his order, it is sought to make him believe that he is getting his work for less than the usual price, *held* not a deceit which injures the customer or competitors, and not such as to authorize a "desist" order by the Federal Trade Commission.

Alschuler, Circuit Judge, dissenting.

Petition for Review of an Order of the Federal Trade Commission.

Petition by the Chicago Portrait Company for review of an order of the Federal Trade Commission. Order vacated.

John T. Evans, of Chicago, Ill., for petitioner.

William A. Sweet, of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Petitioner (called company) asks that the order to cease and desist, entered against it by respondent (called Commission) in 1923, be set aside (Federal Trade Commission v. Chicago Portrait Co., Docket No. 840).

The company, the largest concern of its kind in the United States, for more than 30 years has been engaged in taking orders for and making portraits of parents and other near relatives of its customers by coloring and finishing photographs enlarged from old photographs furnished by the customers. In the years 1919 to 1921, it did a business annually of from $2,500,000 to $4,000,000; the smallest business being in 1921. It had annually 250,000 to 300,000 customers, some in every state.

The order covers two things only, and they are to cease and desist:

"From representing to customers or prospective customers that the usual prices which it receives, or has received for its portraits, are greater than the prices at which similar portraits are offered, to such customers or prospective customers, when such is not the fact.

"From using any trade check or other device, in such a way as to directly or indirectly represent to customers or prospective customers that portraits offered by respondent have greater selling prices than the prices at which same are offered, when such is not the fact."

There were many charges in the Commission's complaint and many findings of fact. The evidence was taken before an examiner, and not before the Commission. There was much evidence upon which there were no findings, and some of the findings are not justified by the evidence, nor material under the complaint.

The matters covered by the order were representations made in two "sales talks," one of which was discontinued 60 days after the complaint was filed in September, 1921, and the other in January, following. There is no evidence that the misrepresentation as to the usual sale price was made after the "sales talks" were discontinued, but in its answer the company asserted its right to use, and that it was continuing to use, the envelope drawing method. The "sales talk," discontinued in January, 1922, shown in the margin,[1] contains all the alleged misrepre-

[1] Commission's Ex. No. 2.

Discontinued (Stamped)

Moseley's Method Abridged.

Approach. Good morning, this is the Myer farm, I believe. (Yes.) Thank you. I understood it was. I was sent here to see you. (Enter.)

Introduction. Pardon me, how do you spell your name? (M-y-e-r.) I wasn't sure. My name is Moseley. I came out from Bloomington to see our old friends and customers.

Mission. I am advertising some new art work. Mrs. Brown and Mrs. Sims say it is the finest they have ever seen. (Open case.) Isn't that fine?

Explain Sample. Mrs. Myer, there are many things which make this painting beautiful. You will notice it is oval with a raise in the center showing a natural rounded forehead and chest. Notice how the artist has brought out the features. Notice how the hair is painted. You can see every stroke of the artist's brush, with just enough color in the face to give it life and warmth. The background is taken from our famous sepia paintings. It seems to set the person right out into space. This wonderful painting is our special handmade Tritone.

Method of Advertising. Now, Mrs. Myer, all concerns advertise in one way or another, but instead of our company paying the money for advertising in newspapers, magazines and farm journals, we decided to come right among the people and give them the benefit of the advertising money.

Satisfied Customer. We believe that a satisfied customer is our best advertiser. Don't you think that is true?

Distribution. I might come out here and place these paintings in the first homes I came to, but if I did, some of our old customers would feel that we did not give them fair treatment, so we have arranged to treat everybody alike.

Explain Contest. Now, Mrs. Myer, the way we are distributing these paintings is through an old fashioned contest like you have in church affairs. Take one. Just advertising. I have a big surprise for you if you are fortunate. We will just lay this one down. Each home is entitled to two envelopes free. Now I will tell you what a grand thing it is if you are fortunate.

Explain Price. We have made paintings like these for schools, colleges and other institutions only instead of selling them for $50 or $100 we are selling them for $20, but if you get a check it is worth $10 to you.

Good Photographs. But we reserve two rights. You must have a good clear photograph and it must be a member of your family or a near relative.

Show Photographs. Here is what I mean by good photographs. These are Mrs. Smith's two little girls and here is Mrs. Brown's father and mother. Mrs. Brown certainly was fortunate. She got a big check and is getting her mother's free.

Customer Has Check. Now for the big laugh.

sentations except the following, taken from the "sales talk" discontinued in 1921, "When we sell this work we get $20 for each painting."

With reference to the trade checks, the Commission found that: " 'Checks' or trade checks mentioned herein were printed slips issued by respondent and countersigned by its sales agents, purporting to represent $10 or $15, as shown by the face of the check, in payment for the standard portraits sold by respondent. Whether placed in the hands of prospective customers through the device of 'a drawing' from the salesman, as was sometimes done, or given directly to the prospective customer by the salesman, every prospective customer for standard portraits thought desirable to do business with was given such a check. This check was merely a device for getting the attention of the customer and thus aiding in making the sale."

That is precisely the claim made for it by the company. The Commission also found that the representation made "that respondent ordinarily and usually sold its standard portraits for $20 each," was a false representation, "deliberately made for the purpose of deceiving and misleading such customers, and prospective customers, and had a capacity and tendency to mislead and deceive, and did mislead and deceive, such customers and prospective customers into the belief that the prices then being asked for such standard portraits were far less than the usual prices obtained by respondent for such portraits, and far less than the usual and actual selling or market value of such portraits."

No salesman, customer, or other person, who might have known the effect of that representation upon any customer, testified, and,

except that the Commission had before it the evidence that the representations were made, just as we have all the evidence before us, there is nothing to show that any one was deceived or misled.

The complaint alleges that the company carries on its business in direct competition with others. There is a finding: "Respondent is the largest concern in the United States in its field of activity. * * * Among its competitors are the Syracuse Portrait Company, of Syracuse, N. Y., and the Roman Oil Portrait Company, the Commercial Portrait Company, the Ætna Copying Company, and the Pacific Portrait Company, all of Chicago, two or more of which do similar business along similar lines in the various states of the United States."

The evidence, in so far as it shows anything about competitors, is that they were using the same alleged objectionable methods used by the company. In the "sales talk" shown in the margin, supra, is the following: "Method of Advertising. Now, Mrs. Myer, all concerns advertise in one way or another, but instead of our company paying the money for advertising in newspapers, magazines and farm journals, we decided to come right among the people and give them the benefit of the advertising money."

The Commission found that statement false, and that some advertising was done. It also appears that the company said it had the best equipped studios and laboratories in the world. No attempt was made to show that was not true. Neither of those matters was made the subject of any charge in the complaint. The latter was not referred to in any finding, and neither was noticed in the order to cease and desist, so we may dismiss them from consideration.

---

Too bad, you are not very fortunate, are you? Well, it didn't cost you anything. I declare! And it is a big one. You get one painting free. I congratulate you. Now bring out three or four of your best pictures and I will see if we can accept any of them. I have my tester here.

Accepting Photographs. This is a picture of your father and this of your mother. They are all right. We can accept them in fine shape. You get this one of your father in this $20 work for $10, and we are going to make you a $20 painting of your mother absolutely free. $40 worth of work for $10.

Closing Point. But we are going to ask one favor of you, that you will tell your neighbors and friends who made the work. You will certainly do that, won't you?

Write up Order. What is the number of your trade check? And your route number is 3, isn't it? What is your husband's name and initial? All right.

Receipt. Now, Mrs. Myer, here is a receipt

for your photographs, showing a credit of $10 on your father's painting and that you get a painting of your mother absolutely free for boosting.

Date of Delivery. This receipt also shows that your painting will be delivered soon after —— (delivery date).

Customer Signs. This is my name. Please place your name on this line and I will leave this copy with you.

Explain Frames. Now, Mrs. Myer, these paintings will be delivered in suitable frames. If the style and the price of the frame suit you, you can buy the frames. Otherwise just pay $10 in cash and the trade check which I have made payable to you for the paintings.

Salesman's Verification. Now, let us see that there is no misunderstanding. What are the paintings to cost you in cash? And what did I tell you about the frames? (Yes, that is correct.) We are going to make you two fine paintings and I know you will be a good booster for us. Good day.

It seems clear that, in all the authorities cited, the unfair method of competition was found in false advertising touching or affecting the relation between the advertiser and his competitors.

In Sears, Roebuck & Co. v. Federal Trade Comm., 258 F. 307, 311, 169 C. C. A. 323, 327 (6 A. L. R. 358), in the majority opinion, this court said: "The commissioners, representing the government as parens patriæ, are to exercise their common sense, as informed by their knowledge of the general idea of unfair trade at common law, and stop all those trade practices that have a capacity or a tendency to injure competitors directly or through deception of purchasers. * * *"

, In Federal Trade Comm. v. Sinclair Refining Co., 261 U. S. 463, 475, 43 S. Ct. 450, 454 (67 L. Ed. 746), the practice of Sinclair Company was challenged as an unfair method of competition within the meaning of section 5 of the Federal Trade Commission Act (Comp. St. § 8836e). The court said: "The powers of the Commission are limited by the statutes. It has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those engaged in the conflict for advantage called competition. The great purpose of both statutes (Clayton and Federal Trade Comm. Acts) was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain."

In Kinney-Rome Co. v. Federal Trade Comm., 275 F. 665, 669 (18 A. L. R. 542), this court held: "Unless that which petitioner did fraudulently affected some competition in which either or both were interested, then the order to cease and desist was improvidently entered."

It is urged that Federal Trade Comm. v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729, broadens and extends the interpretation of the words "unfair methods of competition." In that case the court said: "The findings here involved are clear, specific and comprehensive; the word 'Merino' as applied to wool 'means primarily and popularly' a fine long-staple wool, which commands the highest price. The words 'Australian Wool' mean a distinct commodity, a fine grade of wool grown in Australia. The word 'wool' when used as an adjective means made of wool. The word 'worsted' means primarily and popularly a yarn or fabric made wholly of wool. A substantial part of the consuming public, and also some buyers for retailers and sales people, understand the words 'Merino,' 'Natural Merino,' 'Gray Merino,' 'Natural Wool,' 'Gray Wool,' 'Australian Wool,' and 'Natural Worsted,' as applied to underwear, to mean that the underwear is all wool. By means of the labels and brands of the Winsted Company bearing such words, part of the public is misled into selling or into buying as all wool, underwear which in fact is in large part cotton. And these brands and labels tend to aid and encourage the representations of unscrupulous retailers and their salesmen who knowingly sell to their customers as all wool, underwear which is largely composed of cotton. Knit underwear made wholly of wool, has for many years been widely manufactured and sold in this country and constitutes a substantial part of all knit underwear dealt in. It is sold under various labels or brands, including 'Wool,' 'All Wool,' 'Natural Wool,' and 'Pure Wool.' * * * The Winsted Company's product, labeled and branded as above stated, is being sold in competition with such all wool underwear, and such cotton and wool underwear."

The Winsted Company used, in branding its cartons, words indicating that the contents were all wool and some of the markings indicated an all wool content of very high quality; whereas, none of the packages contained underwear that was all wool. The court further said:

"The facts show that it is to the interest of the public that a proceeding to stop the practice be brought. And they show also that the practice constitutes an unfair method of competition as against manufacturers of all wool knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their product truthfully. For when misbranded goods attract customers by means of the fraud which they perpetrate, trade is diverted from the producer of truthfully marked goods. * * *

"As a substantial part of the public was still misled by the use of the labels which the Winsted Company employed, the public had an interest in stopping the practice as wrongful; and since the business of its trade rivals who marked their goods truthfully was necessarily affected by that practice, the Commission was justified in its conclusion that the practice constituted an unfair method of competition."

In the case before us there is nothing comparable to the facts in the Winsted Case. There are here no facts, nor findings of fact

supported by evidence, that any one was in any way injured, or could have been. The falsehood about the usual sale price was reprehensible, and an unworthy device to be employed in trade; but it had no tendency to injure any competitor.

That which was said was about the company's own selling price. The portraits had no commercial value, as illustrated by a witness who said: "The value of a portrait I would judge it in this manner. Suppose you had a portrait made of your grandfather, which was a very good portrait. You thought it was very good, a fine portrait. I would not give you two cents for it, it would be worth nothing to me, but you might say it was worth one hundred dollars to you."

The company was selling family portraits, not to be worth so much money but to be of the kind and quality of the sample there exhibited. There is no evidence or finding that any purchaser was dissatisfied because the portrait delivered was not equal to the sample exhibited. The finding as to price paid is that: "Thousands of such portraits were sold at the price of two for $10 or $10 for one with one free, and no such portrait was sold for $20 by respondent in the ordinary course of its business. Respondent, in the course of its business, at times in 1920 and 1921, did sell such 'Tritone' portraits and like standard portraits known as the 'Auratone,' for $12.50 or for $15, in each case giving with the portrait so sold another similar portrait free, so that the actual prices at which such portraits were sold were at no time greater than $6.50 or $7.50 each."

The drawing of the trade check was made before a sale was even talked about, and nothing was paid then or afterwards for the privilege of drawing. The drawer might have thought he was taking a chance, but in fact he was not. The agent had said, "We have arranged to treat everybody alike," and every purchaser drew a trade check. The purchaser might have been deceived in some small way, but certain it is that he was not injured, nor was any competitor injured.

From the forbidden acts there seems to us to be no possibility of injury to competitors, and we are of opinion that they are neither within the letter nor the spirit of the act.

The order is vacated.

ALSCHULER, Circuit Judge. I cannot concur in the result. The alleged "drawing" is a sham device conceived for the sole purpose of making prospective customers believe that if they draw lucky numbers they will have the advantage of securing pictures at prices greatly below what petitioner's other customers must and do pay for them, while in fact there is no chance or lottery about it. Every prospect is approached in the same way, and all pay the same price; all through this scheme beguiled into believing they are of the exceptional few whom fortune favored. While it is a rather mild sort of fraud, to my mind it is none the less of the very essence of unfair competition toward all who make or sell, interstate, enlarged photographs, falling fairly within the corrective provisions of the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k).