## THOMAS v. FEDERAL TRADE COMMISSION.

### No. 2093.

Circuit Court of Appeals, Tenth Circuit.

Dec. 14, 1940.

Charles H. Haines, of Denver, Colo. (J. Frederick Schneider, of Denver Colo., on the brief), for petitioner.

James W. Nichol, of Washington, D.C., Sp. Atty., Federal Trade Commission (W. T. Kelley, Chief Counsel, Martin A. Morrison, Asst. Chief Counsel, and Carrel F. Rhodes, Sp. Atty., Federal Trade Commission, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to review an order of the Federal Trade Commission.

Chester L. Thomas, doing business under the trade name, Thomas Quilt Factories, is engaged in the manufacture of feather quilts at Denver, Colorado. The business was established in July, 1923. At the time of the hearing before the trial examiner in September, 1938, the factory was operating one seven-hour shift and one five and one-half hour shift per day and was producing 200 quilts per day. About 80 people are employed in the factory, 12 in the office, 25 in the advertising department, and 150 as field agents. Thomas sells directly to the retail purchaser. His agents are supervised by district managers and zone managers. Up to 1930, his sales were confined principally to the state of Colorado. In 1930, he adopted a new selling method, the details of which are substantially as follows: A list of prospective purchasers in a particular community is made up from telephone and city directories, to whom circulars are sent. The circular represents that the Thomas feather quilt is the warmest quilt known to mankind and advertises a sale at one-half price for five days only. It contains the following, "If interested, return this card at once for full details of this wonderful one-half price sale. No postage needed—Just mail it now!" After the preliminary circularization, Thomas causes an advertisement of the sale to be inserted in a local newspaper in the community in which the sale is to be held. Typical of these advertisements was one entitled, "Limited Half Price offer on genuine Thomas Feather-Quilts," and which contained the following statements:

"During the next 5 days you and other quality minded residents of this city may reserve the right to purchase two genuine

Thomas Feather-Quilts for the usual price of one!

"The 'World's Warmest Quilt,' recently designed by the nation's foremost sleep specialists, allows you to enjoy a new kind of health-giving, 'Re-Vitalizing' sleep. * * *"

Attached to the advertisement is a coupon to be mailed to Thomas Quilt Factories, Denver, Colorado. After the advertising campaign has been carried on in a community, agents go there and solicit orders for quilts at $18.75. When an agent obtains an order he collects part of the purchase price, remits it with the order, and the quilt is shipped with instructions to the carrier to collect the balance of the purchase price on delivery. A sale in a given community lasts from five to eleven days but averages about five days. In the foregoing manner sales have been conducted in various communities in nearly all the states of the United States. It is the policy of Thomas to repeat these sales in each of the selected communities once each year. If an offer to purchase is received after the sale has terminated, a form letter is sent out stating that the special price is no longer in effect and quoting the quilt at $37.50. But, in the same letter, factory irregulars are quoted at $20 for one, or two for $37.50, and it is stated that "Except for a few barely noticeable imperfections in material or workmanship, these quilts are identical in every way to our first quality" quilts, and "you may now take advantage of a $17.50 discount on each of these beautiful Thomas Feather-Quilts."

Millions of pieces of direct mail literature advertising such sales have been sent out by Thomas. During the period from 1930 to the time of the hearing in September, 1938, in excess of 95 per cent of the sales made by Thomas were through the special sale method. His sales in 1937 were approximately $500,000. He estimated that they would run nearly $1,000,000 in 1938. There was no proof that any quilt had ever been sold at $37.50. In answer to the question, "Have you ever received $37.50 for one of your quilts," Thomas testified, "It has been the factory policy for several years last past to quote and charge any purchasers direct from the factory the regular retail price of $37.50."

The quilts were filled with chicken feathers. There was proof that salesmen frequently represented them to contain goose and wild duck feathers. Where a purchaser complained that the quilt contained chicken feathers, it was the practice of Thomas to offer an adjustment of $5 per quilt. Thomas claimed that through a special process, he was able to produce a superior quilt with chicken feathers.

In its complaint the Commission alleged that Thomas sold his products in competition with other individuals, partnerships, and corporations, and engaged in the business of selling and distributing quilts and other similar products in interstate commerce. This allegation was expressly admitted in the answer.

The evidence established that Thomas competes with all kinds of bed covering, but principally with the better grade of down quilts. Down quilts are filled with the feathers of any aquatic bird. They have been on the market for many years and have a reputation of being excellent bedding material.

Many persons who purchased Thomas quilts filed complaints with Better Business Bureaus.

Thomas continued to use the selling method above described up to the hearing before the examiner.

The Commission found that the price of $18.75 is not a reduced price or a special or introductory price, but is the customary price at which the quilts are sold by Thomas in the regular course of business at all times, and that the statement that the price of $18.75 was one-half the regular price was false and misleading and calculated to, and did, mislead and deceive a substantial portion of the purchasing public, and that as a result, the consuming public has purchased a substantial volume of Thomas quilts and trade has been diverted unfairly to Thomas from competitors. It ordered that Thomas cease and desist from

"1. Representing as the customary or regular prices or values of quilts or other bed covering prices and values which are in excess of the prices at which such products are regularly and customarily sold by respondent in the normal and usual course of business;

"2. Representing that the prices at which respondent offers for sale and sells his products constitute a discount to the purchaser, or that such prices are special or reduced, or introductory prices, or that such prices are applicable for a limited time only, when in fact such prices are the

usual and customary prices at which respondent sells such products in the normal and usual course of business."

Counsel for Thomas assert that the evidence does not support the findings of the Commission, and does not warrant the Commission's order.

The authority of the Commission to issue the order is derived from § 5 of the Federal Trade Commission Act, 38 Stat. 717, 719, 720, as amended by the Act of March 21, 1938, 52 Stat. 111, 15 U.S.C.A. § 45.

■ By the statute the Commission is empowered and directed to prevent persons, partnerships, or corporations, with certain exceptions not here material, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

Under the original act, unfair methods of competition in commerce were declared unlawful. By the amendment, unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are declared unlawful.

■ A proceeding by the Commission to prevent the use of the unfair methods or unfair or deceptive acts or practices in commerce must appear to be in the interest of the public. Federal Trade Commission v. Raladam Company, 283 U.S. 643, 646, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191.

During the period from 1930 to and including September, 1938, practically all, if not all, the sales made by Thomas were effected by the special method first adopted in 1930, and few, if any, sales were made at the so-called factory price of $37.50. The method was not limited to one special sale in a community, but sales were repeated at intervals of about one year in each community. It is true that when a customer undertook to purchase a quilt from the factory, the price of $37.50 was quoted, but along with that quotation was an offer to sell factory irregulars represented to be equal to first quality quilts, except for barely noticeable imperfections, and the state-

ment was made "You may now take advantage of a $17.50 discount on each of these beautiful Thomas Feather-Quilts," and when Thomas was asked if he had ever sold a quilt for $37.50, he gave an evasive answer. It follows, we think, that the price of $18.75 was not a special or introductory price, nor a half price, but the regular price at which Thomas usually sold his quilts.

That many purchasers were misled and deceived into believing that the quilts were being offered at one-half the regular price, and were thereby induced to purchase, cannot be doubted. The representation that an article is offered at one-half the regular price is a potent factor in effecting sales. Undoubtedly, it resulted in drawing customers to Thomas and away from sellers of down quilts, with whom he was admittedly in competition.[1]

No doubt, a substantial portion of the public was misled by the circulars and other advertising matter and it follows that the public had an interest in stopping the practice as wrongful.[2]

Counsel for Thomas rely upon John C. Winston Co. v. Federal Trade Commission, 3 Cir., 3 F.2d 961, and Chicago Portrait Co. v. Federal Trade Commission, 7 Cir., 4 F.2d 759. These cases arose before the 1938 amendment to the Federal Trade Commission Act. In the former, the complaint was based upon alleged deceptive acts or practices and the court found that there was no deception, and hence, no unfair competition. In the latter case, the court held that the practice had no tendency to injure any competitor. For these reasons, they are clearly distinguishable from the instant case.

■ We conclude that Thomas was guilty of unfair methods of competition in commerce and unfair and deceptive acts and practices in commerce and that the proceeding by the Commission was in the interest of the public.

Let a decree be entered affirming and enforcing the order.

---

[1] See Brown Fence & Wire Co. v. Federal Trade Commission, 6 Cir., 64 F.2d 934, 936; International Art Co. v. Federal Trade Commission, 7 Cir., 109 F.2d 393, 397.

[2] Consolidated Book Publishers v. Federal Trade Commission, 7 Cir., 53 F.2d 942, 945; Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729.