## OHIO LEATHER CO. v. FEDERAL TRADE COMMISSION.

### No. 5393.

Circuit Court of Appeals, Sixth Circuit.

Nov. 12, 1930.

C. F. Smith, of Youngstown, Ohio (Harrington, DeFord, Huxley & Smith, of Youngstown, Ohio, on the brief), for appellant.

E. J. Hornibrook, of Washington, D. C. (Robt. E. Healy and James W. Nichol, both of Washington, D. C., on the brief), for appellee.

Before DENISON and HICKS, Circuit Judges, and JONES, District Judge.

DENISON, Circuit Judge.

The petitioner, the leather company, began, in 1922, to put upon the market a certain kind or brand of leather under the trade-name of "Kaffor-Kid,"[1] and, at the time of the filing of the complaint by the Commission, a large trade therein had been developed. This leather is made only from the skins of calves, not more than twelve days old and called "deacons," which have been fed entirely on milk and have not begun to eat grass. The leather so made is softer in its texture and more delicate and pliable than that which is made from the skin of older calves—the standard "calfskin." This leather is sold only to shoe manufacturers, and the shoes made therefrom by the various manufacturers are sent out to the retail trade. This trade-name "Kaffor-Kid" is used by the leather company in its trade journal advertising, and the rolls of leather sent to the shoe manufacturers have this name stamped upon the wrapper. Occasionally, though rarely, the shoe manufacturer has stamped the name upon the carton containing shoes made therefrom, and, in this way in a small degree, but mainly by the advertising and through salesmen, the name reaches the shoe retailer. The leather company has also put out display cards, intended to stand on the retailer's counters or in his

[1] Said to be developed through "Calf-for-Kid."

windows, containing the trade-name in an attractive form. Upon these display cards, as well as in practically all the advertising of the leather company, the article was further described as "a distinctive calf leather," or by a more complete account of its advantages as a special type of calf.

Upon the request of manufacturers who thought their trade was injured by this practice, the Commission filed its complaint, alleging that the leather company was guilty of unfair competition with its competitors, in that the use of this trade-name induced the belief that the leather was kid when, in fact, it was not. After answer and the taking of proofs, the Commission made its findings of fact, and an order that the leather company desist and refrain from the use of this name. The leather company filed in this court its petition to review and vacate, and the Commission filed an answer in the nature of a cross-bill, asking the enforcement of its order.

The case is unique in some particulars, which appear as the history of the matter is examined. We assume from the record that originally kid leather and kid shoes were made from the skin of a young goat, properly called a "kid." At an early period, when the skin of older goats, which were not kids, was used for this purpose, it was under names which were more or less arbitrary, as "Morocco," "Dongola," etc. In 1878, one Foerderer devised and patented a process, by which he could tan the older and tougher goat skins so as to have the appearance and qualities of the true kid; and, giving this a glazed finish, he called it "Vici-kid." After his patent monopoly expired, his competitors put out a similar product from the same skins and leather, which they called "glazed-kid." These products met with a large adoption. During the war, and about 1918, the various manufacturers' associations, making different kinds of leather, were brought together in one body, called the "Tanners' Council," and an endeavor was made to standardize products and nomenclature. It was then agreed among those so associated that they would consider as kid leather that which was made from the skin of a goat, young or old, and not that made from any other animal.[2] The record shows also that those who buy leather— that is, the shoe manufacturers—have adopted the same term, and, to them, "kid shoe," is the proper descriptive name for shoes made

from the skin of a goat, old or young (or some sheep). This is plainly not the primary, but rather a secondary meaning; but its adoption by tanners and shoe manufacturers has been general and long enough to justify it as the natural meaning to them. Whether this secondary meaning also prevails among the shoe buying public—the ultimate consumers—is not shown by the record. Finding No. 7 contains the express statement that this meaning is known to and generally accepted by both the "shoe and leather trade," and the "public." If by "public" is meant the shoe manufacturers who buy the leather, the finding is not to be challenged; if the shoe retailer is intended to be included, the finding is supported by evidence, though there is much conflict; but if by this phrase is meant the ultimate buying public who purchase the shoes over the counter, the finding is to that extent not supported by any substantial evidence, and cannot be accepted. We have examined the record with care with this point in mind, and we find nothing indicating that any ultimate consumer understands that kid leather may be, and most of it is, made from the skins of animals which are not kids.[3] There is much tending to the contrary. (See note 6.) Certainly the initial presumption must be that the purchaser at a retail store, when he buys kid shoes, or kid gloves, would suppose that he was getting precisely what the word indicated and not something else; but if, in the absence of any proof, this initial presumption is not to prevail, we find much to indicate that the ordinary purchasers, of ordinary intelligence, would have in mind chiefly the appearance, feel, and quality of the leather, and would understand that they were asking for these qualities rather than for any specific skin ancestry. There well may be a common, if not general, understanding among the shoe wearers that the leather on the market called "kid" is made from many different raw materials, and that its proper designation depends upon the methods of treatment and manufacture. Reference may be had to "kid gloves." The cases are not parallel, but there is close analogy. It would seem that the public understanding and opinion as to the materials to be found in kid gloves and in kid slippers, or shoes, would take similar form; and yet there is considerable available information, though it is summarily covered by casual references in the record, to the effect that the retail buying public under-

[2] Though they do include as a source of "kid" leather, the "cabretta" or "cavrette" skins—this animal being a sheep. See note 6.

[3] Ninety per cent. of the all "kid" shoes, under the trade definition, are made from the skins of older goats.

stands well enough that the ordinary grades of so-called kid gloves on the market are not kid at all, or even goat, but are made of different leathers, subjected to manufacturing processes which give them the feel and quality of kid, and that when it asks for "kid gloves" it is indifferent as to the origin of the leather. (Note 6 at end of opinion.)

■ Upon this subject—what the retail shoe buying public understands by "kid," and whether it is, in fact, misled to its prejudice by the use of this term "Kaffor-Kid"—the record is very unsatisfactory; and we think no final disposition of the controversy should be based upon it. The order cannot be sustained in the absence of an affirmative finding based upon substantial evidence, to the effect that the consuming public, asking for kid shoes, desires and expects to get shoes made from the skin of a kid, or of a goat, as the case may be. The present record being insufficient, it should be remanded, in order that all parties interested may take further proofs and have a finding made, if, indeed, the proofs may then justify any definite conclusion.

The misleading of the ultimate public to its prejudice does not, of course, depend upon whether the substitute is equally as good as the original; the purchaser is entitled to get what he asks for, even if he is put off with something as good or better;[4] but the qualities of the two articles are not immaterial in determining the purchaser's real intention and desire. It is said here that the leather in question, made from a very young calf, closely corresponds to the true kid leather in every quality—more closely than do many of the goat skins, sold by the leather company's competitors under the name of kid. The Commission has not thought this to be material, and has not made findings thereon; but if the purchaser expects to get only a certain type of leather, then the correspondence in qualities becomes important.

The misleading of the ultimate purchaser depends upon his understanding, and is, in this case, vital; the lack of proof or finding cannot be overlooked. All witnesses agree that, while the leathers are very similar in most qualities—perhaps in all essential qualities—there is a difference in the grain, or appearance, which a leather or shoe expert would notice at once. It therefore is conceded that no shoe manufacturer or shoe dealer has ever been in any way misled, but that, in every instance, he has fully understood that

he was buying a particular and special tannage of calfskin; and it is equally clear that no such manufacturer or dealer will be so misled in the future. There is, therefore, no basis for any charge of unfairness, excepting as the mere use of the name "Kaffor-Kid" may carry to the nonexpert, the final purchaser, a false implication that the material is not what he understands by the term "kid."

■ The petitioner, leather company, urges that, even if the ultimate purchaser is induced to buy calfskin when he intends to get that something else which he believes is indicated by the term "kid," yet the petitioner's connection is too remote to justify compelling it to discard the name. If there is misrepresentation to the final buyer in the use of "kid" for this leather, and in connection with any noncorrective word, it is inherent in the very term. In our recent opinion in Berkey & Gay Co. v. F. T. C., 42 F.(2d) 427, we found that the use by the manufacturer of the word "walnut" carried no implication that the wood was solid walnut rather than laminated; there was no inherent misrepresentation to be put before the final purchaser; the manufacturer was not to be held for any intentionally false statement the retail salesman might make. Here, if the final purchaser does not understand that to say a shoe is "kid" means that it is goat skin, no case is made out; if he does so understand, then misrepresentation would be implied in the name; and if that name, unexplained, is intended to and does reach the typical retail customer, the manufacturer of the leather who puts out the article with that name must carry the responsibility. So much depends upon what the ultimate consumers understand—if anything—by the word "kid" in connection with footwear, that we are not inclined to consider, upon this record, whether or not sufficient precautions have been taken, or may be taken, to prevent or make improbable any serious misleading of this class.

There is in this record no worthwhile proof of any actual deception of the purchaser by the retailer;[5] but that may not be necessary; the inherent tendency and opportunity may be enough, if the tendency exists and the opportunity is left effectively open.

[4] The Kaffor-Kid is said to have all the qualities of the true kid, and, in addition, the greater strength of the calfskin.

[5] A purchaser says she asked at a certain store for "kid shoes," and was sold a pair made from Kaffor-Kid, with the explanation that it was "a new kind of kid." It appears, with seeming certainty, that at the time fixed this store did not have any Kaffor-Kid shoes. As to such an incident, occurring several years back, human recollection is too uncertain and the exact details are too important to give such proof of a single instance substantial weight as tending to show any general probability of a frequent or serious practice.

We must also accept the Commission's conclusion that the differences between the "Kaffor-Kid" and that goatskin leather, which is said to be rightly called "kid," are not sharp and plain enough to insure that the ordinary shoe purchaser would recognize each for what it is—calf, or goat. Perhaps the preponderance of evidence is against this conclusion. It is supported by the personal judgment of a few selected individuals, who may or may not be fairly representative of the class of ordinary purchasers; it is opposed by the opinion of a large number of retailers, who ought to know the general view of buyers; but the physical exhibits before the Commission and the leather company's claims of similar qualities must also be considered. Undoubtedly there is substantial evidence supporting the finding; and we can look no further. Winsted Hosiery Case, 258 U. S. 483, 491, 42 S. Ct. 384, 66 L. Ed. 729.

We recently had occasion to reaffirm our belief that there is no jurisdiction in the Commission to make an order of this kind unless there is a legitimate trade which equitably deserves protection in order that the defendant's unfair methods may not tend to restrain the trade of the fair and legitimate competitors. Raladam Co. v. F. T. C., 42 F. (2d) 430, 435, certiorari now allowed 51 S. Ct. 86, 75 L. Ed. ——. The present record presents this question in a peculiar form. The manufacturers of what they call kid leather, and possibly, in some measure, the manufacturers of calfskin, may suffer from this method of competition—the former, if trade is diverted from the goatskin by the supposition that "Kaffor-Kid" is the same thing, and the latter, if trade is diverted from the regular calfskin by advertising something as if better but perhaps at the same price. We do not suppose that the Commission's typical order to desist and refrain is made an inappropriate remedy, merely because some of a respondent's trade competitors are using the same unfair method which is charged against it; the Commission could not stop all these things at once; but, in that aspect of the Commission's future action in this case which may rest upon the theory that the ultimate purchaser supposes that kid is kid, and that kid shoes are made from kid leather which is made from kid skins, and thus is misled because the defendant is tacking the name to leather not made of those skins at all, we find that the entire associated trade, which is complaining and which the Commission is intending to protect, is also misleading the ultimate purchaser in a similar way. Lacking any proof that the purchaser did know anything about the secondary meaning which prevails among the experts, the result would be that the Commission stops the defendant from misleading the purchaser, and does so with the sole purpose and sole result of aiding and abetting a much greater volume of misleading practice by the rest of the trade. We can confidently say that no such result, coming from such construction of the act, can have been intended by Congress. Upon that other aspect of this case which may rest on the supposition that the shoe users think "kid" means "goat," this comment just made would of course not be justified.

The order will be that the "desist and refrain" order of the Commission be vacated, without prejudice to its further future orders in the matter, that the prayer of the cross-bill-answer be denied, and that the case be remanded to the Commission for the taking of further proofs, and, if the Commission desires, further findings—all in accordance with this opinion.[6]

---

[6] Uncertainty as to whether a purchaser who calls for kid shoes expects to get goatskin leather is indicated by direct testimony in the record to the effect that buyers have no intelligent desire in this respect, and by the proofs that, perhaps continuously, for thirty years, other skins than goat have been specially treated and sold under some broad name, including "kid," in considerable volume. Aristo kid, calfkid, Novilla kid, Royal kid, Rue kid, Kangaroo kid, mat kid—these terms must have tended to establish a generic meaning. This indication finds, in the mind of the writer of this opinion, additional plausibility, because, though he has worn vici kid shoes for thirty years, he has taken it for granted, and because of the obviously insufficient supply, that they could not be from true kid skin, has never known that they were made from goatskin, but has assumed that, whatever the original leather, they were the product of some treatment which gave the qualities for which "kid" was a generic name. Others may have the same supposition. Research among available information (of some of which, but not all, judicial notice could be taken) tends to support this impression—very strongly as to kid gloves—and substantially as to kid shoes.

Webster's Imperial Dictionary: *Kid.* "5. Leather made from the skin of a young goat, or an imitation of it made of various other skins"; and the adjective is defined as "made of leather called kid."

Century Dictionary: *Kid.* "3. Leather made from the skin of a kid, used in making shoes and gloves. Much of the leather so used and sold as kid, is made from other skins. * * * *Plural.* Gloves made of kid, or of the leather so-called"; and under the corresponding adjective definition, it is said: "*Kid gloves.* A glove made of kid leather, or, in trade use, of other soft leather resembling kid."

Murray's Oxford Dictionary: *Kid.* "3. The skin of a kid, or leather made from kid skins, or from lamb skins or other substitutes; chiefly used in the manufacture of gloves and shoes; *plural*, gloves or boots made of this leather." *Kid Gloves:* "A glove made of kid-skin, lamb-skin or other similar leather. * * * Men and women's fine gloves, or those that pass in the shops under the denomination of kid gloves, but which are really made from lamb-

skins." *Kid-Skin:* "The skin of a kid, especially such skin tanned and used for gloves; also applied to skins of lambs and other animals used for that purpose."

Encyclopedia Britannica: *Leather* subhead, "Sources and qualities of hides and skins," subsubhead, "Light Leathers." In discussing sheep, this is said: [Skins of] "lambs not over a month old are worth much more than when they have lived for three months; they are used for the manufacture of best kid gloves and must be milk skins. Once the lambs have taken to grass the skins supply a harsher leather." [The same is true of calf-skins at the age of about two weeks.] *Gloves,* sub head, *Manufacture,* "For leather gloves skins of various animals are employed, deer, calves, sheep and lambs, goats and kids, etc., but kids have had nothing to do with the production of many of the 'kid gloves' of commerce."

Encyclopedia Americana: *Leather and Shoe Trade Technical Terms—Castor*—Suede finished kid, for gloves, usually in lighter weight than is used for shoes. *Dongola*—Heavy plump goatskin. : * * The terms Dongola, kid, and Morocco, are sometimes used interchangeably. *Elkskin*—A term applied usually to soft tanned calfskin, * ' * called "Elk" because supposed to resemble elk in appearance. *Kid*—Shoe leather made from the skins of mature goats. The skin of the young goat or "kid" is made into the thin flexible leather used in the making of kid gloves, being too delicate for use in shoes. *Mat Kid*—A thin calf skin used for shoe uppers. *Morocco* * * * applied in general to heavy goatskin of any vegetable tannage, used for shoes. *Pebbled Goat*—Tanned goatskin, finished with a pebbled surface.

Much instructive material is found in the Dictionary of Leather Terminology, published by a joint committee of the tanners and leather goods industries, and "dedicated to the public in the interest of truth in merchandising." In the introduction on page 3, it is said: "Many leathers are known commercially or popularly by names of hides or skins of which they are not actually made. Some of the names may have originated in an attempt to describe the article and most of them today are kept alive by trade custom. Names of some skins (like chamois) have come to mean a finish as much as a kind of leather. It has even become necessary to insert the word 'genuine' before some kinds of leather (like buck) to distinguish it from its imitators." The producing skins are in groups. One is the sheep and lamb group, in which are included the wooled skins and cabrettes [The Tanners' Council now thinks it rightful to include the cabretta skins as kid]; and this group is the producing leather for,

among other things, chamois. Another group is the goat and kid group [with no intimation that goatskins are kidskins]. On page 8 we find: "In describing various classes of leather, the name of the animal from which the skin was taken is generally use. Therefore, 'Cowhide,' 'Goatskin,' and similar names infer that the leather is actually made from skins of those animals. Certain exceptions to this have become established trade practice, and comment is made thereon in the definitions which follow." On page 9: "*Chamois leather.* A soft leather originally made from the skins of the Alpine antelope, or chamois, now practically extinct, but at the present time from the fleshers or under-skins of sheepskin, oil-dressed, suede-finished, principally used for cleaning and polishing purposes and for gloves." On page 10: "*Elk.* A purely trade term for cattlehide shoe leather of a special tannage and finish. Genuine Elk leather is designated by the term 'buckskin.' " On page 11: "*Glove leathers. Kid.* Term commonly applied to grain glove leathers from sheep or lamb skins of wool or hair types. This is an instance of the public deceiving itself, as the name clings to the product merely in popular use, and is never used by manufacturers, except for stock actually made of immature goatskins." On page 12: "*Kid.* In general trade and popular usage it has come to refer to shoe upper leather tanned from either goat or kid skins and to glove leather tanned from sheep and lamb skins." On page 13: "*Morocco leather.* Term applied to distinctive natural grain of vegetable-tanned fancy goatskin, to which the name is properly restricted. the name originally indicated leather from Morocco, later was applied to all goatskin leather. Its application to any but fancy goatskin is incorrect, but has been so commonly used in the past that it has become necessary to use the word 'genuine' to define the true leather. As a commercial classification 'Morocco Grain' is applied to embossed imitations of the natural goat grain on other kinds of leather. On page 21: "*French Kid or French Kid Finish.* As the name implies, the original 'French Kid' was made in France and since it was a distinctive finish, the term in time was applied to a special class of leather made in other countries. Today it means leather tanned from kidskin by an alum or vegetable process. In the Glove trade it is usually called 'Genuine Kid.' "

It is to be noted that in this Dictionary of Terminology, in the leather statistics published by the Department of Commerce, and in those published by the Tanners' Council, goat and kid skins are included today in one group for statistical purposes, but there is nothing to indicate their merger under the name of kid.