## ROYAL MILLING CO. et al. v. FEDERAL TRADE COMMISSION.
### Nos. 5958, 6098–6102.

Circuit Court of Appeals, Sixth Circuit.

May 4, 1932.

T. H. Malone, of Nashville, Tenn., for petitioners.

B. B. Bane, of Washington, D. C. (Robert E. Healy and Martin A. Morrison, both of Washington, D. C., on the brief), for respondent.

Before MOORMAN, HICKENLOOPER, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

Nashville, Tenn., if not the center of the flour industry in the South, is at least the

largest center of the self-rising flour industry in the South, if not in the world. The six petitioners are all located in Nashville; they sell self-rising flour throughout the Southeastern States, in interstate commerce, and have built up a substantial industry. If not originators of the process of mixing self-rising flour, nor even its first producers, they were undoubtedly early in the field, and in some respects pioneers in the industry; one of the petitioners having commenced business in 1902, and the others at dates from 1905 to 1925.

"Self-rising flour" is used extensively throughout the South in making griddle cakes, biscuits, and other hot breads, and consists of flour with salt, soda, and phosphate added in proper proportions and properly mixed. The petitioners buy their flour from grinding mills, but are not themselves grinders of wheat into flour. They also market a commodity called "processed flour." This is a blend of two or more flours of different content with a small percentage of phosphate. "Processed flour" tends to counteract an overdose of soda in the hands of an unskilled housewife, and restores to some extent the mineral content of flour removed in the grinding process.

All of the petitioners in their corporate or partnership names use the words "Mill" or "Milling." They also represent themselves as manufacturers. Considerable machinery is required for the making of self-rising and processed flour. Mills that grind wheat into flour and sell in the Southeastern States also produce self-rising flour. The process used by the grinding mills is substantially the same as that of the petitioners, and requires substantially the same machinery and the same amount of time. The petitioners' product, and that of the grinding mills, are in active competition in the territory. There is also evidence that petitioners' product for some time came into competition with the product of one or two concerns in the same business which did not represent themselves as mills or milling companies. This competition, however, was never substantial, and it is doubtful on the record whether it still exists. Most of the petitioners were in the self-rising flour industry before the grinding mills undertook to produce the commodity, although one or two of the petitioners may have begun their enterprises later. Upon occasions some of the grinding mills buy surplus flour from other grinding mills, and when this is done the purchasers sell the flour under their own labels.

Early in the proceedings the petitioners offered by letter, and again in their amended answers, to add the phrase, "Not grinders of wheat," to their trade or corporate names wherever used, to "cut off the possibility of deceiving or misleading any purchaser or customer." No attention was paid to the offer, and after a hearing in one of the cases, and a stipulation adopting the evidence in that case to all of the other cases, the several orders here reviewed were made by the commission, directing the several petitioners to desist from using the words "Mill" or "Milling" in their corporate or trade names, and to cease from making representations that they are manufacturers of flour, or that the flour sold by them comes direct from manufacturer to purchaser.

The proceedings which led to the orders here complained of were begun by the respondent under the provisions of section 5 of the Trade Commission Act (15 USCA § 45). The meaning of the act, its purpose, the extent of the power conferred by it upon the Federal Trade Commission, and its supplementary relationship to the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15) and the Clayton Act (38 Stat. 730), have frequently been considered by this court. L. B. Silver Company v. Federal Trade Commission, 289 F. 985; Procter & Gamble Company v. Federal Trade Commission, 11 F.(2d) 47; Berkey & Gay Furniture Company v. Commission, 42 F.(2d) 427; Raladam Company v. Commission, 42 F.(2d) 430; Ohio Leather Company v. Commission, 45 F.(2d) 39; Federal Trade Commission v. Good-Grape Company, 45 F.(2d) 70. The issues here presented do not, in our opinion, require, nor does their novelty now invite, the careful study there pursued, nor the painstaking argument there presented. It is settled that a complaint may be filed by the commission, interstate commerce being involved, only if it shall appear among other things that a proceeding would be to the interest of the public, that the public interest must be specific and substantial, that this requirement is not satisfied by proof that there has been misapprehension and confusion on the part of purchasers, or even that they have been deceived. Federal Trade Commission v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838; Federal Trade Commission v. Raladam Company, 283 U. S. 643, 51 S. Ct. 587, 75 L. Ed. 1324.

It is clear from the Klesner Case that public interest in an unfair practice may be

said to exist only when a substantial part of the purchasing public is injuriously affected by it or has suffered a loss. "It is not claimed that the article supplied by Klesner was inferior to that of Sammons, or that the public suffered otherwise financially by Klesner's use of the words, 'Shade Shop.'" The mere fact that it is to the interest of the community that private rights be respected is not enough to support a finding of public interest. "Public interest" is sometimes said to exist when the unfair method employed threatens the existence of present or actual competition, when the circumstances involve flagrant suppression of the weak by the strong, or when the individual loss is small, but the aggregate is so serious and widespread as to make the matter of public consequence.

■ There is here manifestly no threat to competition. Such effect as the Commission's orders may have upon the active competition that now exists will be in the direction of stifling rather than of preserving it. There is no oppression of the weak by the strong, the grinding millers being strong concerns organized into powerful trade organizations, and the record fails wholly to establish any injury to the public or any loss suffered by it, either individually or in the aggregate.

It is not shown that the petitioners' product is injurious to the consumer, or that it is in any way different from or inferior to the product of their competitors. Nor did the commission so find. The commission goes no further than to conclude that when the terms "Mills" or "Milling Company" or "Manufacturer of Flour" are used in the flour industry, it is generally understood by dealers and the purchasing public to mean a concern that grinds wheat into flour; that many dealers and consumers prefer to buy flour that comes directly from a concern that grinds the wheat into flour, rather than from one that buys the flour from a grinding concern, because they think that they get from such grinding concern a more uniform product, or better product for less money; that many persons have been buying petitioners' flour because from the use of such words or terms in the names under which they do business they believe that they are manufacturers of flour. There is no finding that either dealer or consumer obtained an inferior product, or a product other than he sought to purchase. The case differs, therefore, in the essential prerequisite of public injury from Federal Trade Commission v. Winstead Company, 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729, and Federal Trade Commission v. Good-Grape Company, supra. Failing to see any public injury, or financial loss in the methods of competition here reviewed, we find no public interest exists, much less one that is specific and substantial. If there is any deception in the petitioners' representations or trade names, it amounts at most to a private wrong, as in the Klesner Case, and one not to be redressed by action of the Commission.

■ Another finding upon which the commission's conclusions are based remains to be noted. The commission found that the petitioners do not have or maintain a laboratory for testing or analyzing flours which they buy or sell; that they use only the paddle test, by which the characteristics or qualities of flour cannot be determined. Assuming this finding to be based upon substantial evidence, we fail to see the appropriateness of the desist order to the evil, if any such exists. Berkey & Gay Furniture Company v. Commission, supra.

The orders of the commission in all of the six cases must be set aside and held for naught.