# FEDERAL TRADE COMMISSION *v.* WINSTED HOSIERY COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

. No. 333.  Argued March 13, 14, 1922.—Decided April 24, 1922.

1. Findings of fact made by the Federal Trade Commission are conclusive when supported by evidence. P. 491.
2. A manufacturer's practice of selling underwear and other knit goods made partly of wool but· labeled as " natural. merino," " natural worsted ", " natural wool " and with other like terms taken by a substantial part of the consuming public and sometimes in the retail trade as indicating pure wool fabrics, with the result of misleading part of the public into buying, as all-wool, garments made largely of cotton and of aiding and encouraging misrepresentations by unscrupulous retailers and their salesmen, is an unfair method of competition as against manufacturers of like garments made of wool or wool and cotton, who brand their products truthfully, and is subject to be suppressed under § 5 of the Federal Trade Commission Act. P. 491. .
3. Such a method of competition, inherently unfair, does not cease to be so because competitors become aware of it or because it

becomes so well known to the trade that retailers, as distinguished from consumers, are no longer deceived by it. P. 493.

272 Fed. 957, reversed.

CERTIORARI to review a decree of the Circuit Court of Appeals setting aside an order of the Federal Trade Commission under § 5 of the Act of September 26, 1914, c. 311, 38 Stat. 719.

*Mr. Solicitor General Beck,* with whom *Mr. W. H. Fuller, Mr. Adrien F. Busick* and *Mr. James T. Clark* were on the brief, for petitioner.

Both from the standard of general public morals and from the legal point of view, the practice of misbranding must be held to come within the category of acts " heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud," etc. *Federal Trade Commission* v. *Gratz,* 253 U. S. 421, 427; *Curtis Publishing Co.* v. *Federal Trade Commission,* 270 Fed. 881, 908; *Sears, Roebuck & Co.* v. *Federal Trade Commission,* 258 Fed. 307.

The legislative history of the Federal Trade Commission Act shows that it was the intention of Congress to make all unfair methods of competition unlawful, and to regulate competition rather than solely to prevent monopoly. The purpose to prevent unfair practices in trade enlarges the natural interpretation of " unfair methods of competition " to include whatever might be against the public interest as obstructing the channels of fair competition, on the preservation of which the policy of the Congress is firmly based.

The practice alleged in this proceeding has all the essential elements that make " passing off " or " unfair competition " an unfair method of competition.

The essential elements of unfair competition as known to the common law are deception of, or fraud on, the public and consequent injury to competitors. The cause

of action seems to be based primarily on the protection to be given to a producer's property right in a trade mark or name, or in the good will attached thereto, against one who simulates them so as to confuse the public and to pass off his goods for another's. It is essential, as the basis of the injury to the complainant, that the deception of the public, or the likelihood of such deception, be shown.

While in the form of the instant proceeding no individual producer is complainant, and no specific individual private injury to property right is set up, such injuries to competitors of the respondent collectively who do not misrepresent follow inevitably from the misrepresentation of respondent's labels. The practices complained of affect a class of competitors and not an individual competitor, whose trade mark or name or product is simulated.

In a proper case of unfair competition, or passing off, at common law, the public is involved, and its deception is essential to the action. The two cases involve the same elements, viz, misrepresentation and deception of the public and consequent injury to a competitor or competitors.

The manufacturer is responsible to the public. Deception of the dealer is immaterial. The deceptive character of the label being granted, its natural and reasonable effect will be presumed, and it is not necessary to show actual collusion of the manufacturer with the retailer to deceive the public. Nims, Unfair Competition, § 381, and authorities cited; *New England Awl & Needle Co.* v. *Marlborough Awl & Needle Co.,* 168 Mass. 154, 155; *Fuller* v. *Huff,* 211 Fed. 610; *Scriven* v. *North,* 134 Fed. 366, 375; *Coca Cola Co.* v. *Gay-Ola Co.,* 200 Fed. 720, 722, 723; *Rubber Co.* v. *Devoe & Reynolds Co.,* 233 Fed. 150, 157; 38 Cyc. 778; *Fairbanks Co.* v. *Bell Mfg. Co.,* 77 Fed. 868, 878; *Estes & Sons* v. *Frost Co.,* 176 Fed. 338, 340.

Only ordinary purchasers, including the unwary and ignorant, need be misled. *Bissell Chilled Plow Works* v. *Bissell Plow Co.*, 121 Fed. 357, 366. See also *Notaseme Hosiery Co.* v. *Straus*, 201 Fed. 99, 100; *Photo-Play Publishing Co.* v. *La Verne Publishing Co.*, 269 Fed. 730; *Samson Cordage Works* v. *Puritan Cordage Mills*, 211 Fed. 603, 610; *Winterton Gum Co.* v. *Autosales Gum Co.*, 211 Fed. 612, 617; *Royal Baking Powder Co.* v. *Donohue*, 265 Fed. 406; *Houston* v. *St. Louis Packing Co.*, 249 U. S. 479; *Thum Co.* v. *Dickinson*, 245 Fed. 609, 613.

The probable effect, not the intention, governs. It is a question of preventing, by the Commission's order, practices or methods which may in reason cause the results of unfair competition, before the effects are realized, and it is not necessary to show the accomplished fact of unfair competition. *Beech-Nut Co.* v. *Federal Trade Commission*, 264 Fed. 885, 890; *Federal Trade Commission* v. *Gratz*, 258 Fed. 314, 317; *Sears, Roebuck & Co.* v. *Federal Trade Commission*, 258 Fed. 307, 311.

Proof of actual intention to deceive is not essential. *Rubber Co.* v. *Devoe & Reynolds Co.*, 233 Fed. 150, 157; *Van Houten* v. *Hooton Co.*, 130 Fed. 600; *Hanover Milling Co.* v. *Metcalf*, 240 U. S. 403, 413. This is the law in England. Kerly on Trade Marks, p. 482; *Cary Sons* v. *Crisp*, 19 R. P. C. 497; *Birmingham Small Arms Co.* v. *Webb*, 24 R. P. C. 27; *Powell* v. *Birmingham Vinegar Co.*, 2 Ch. 54.

Actual deception or damage need not be shown. *Sears, Roebuck & Co.* v. *Federal Trade Commission*, 258 Fed. 307; *National Harness Manufacturers Assn.* v. *Federal Trade Commission*, 268 Fed. 705, 713; *Beech-Nut Packing Co.* v. *Federal Trade Commission*, 264 Fed. 885, 890; *Notaseme Hosiery Co.* v. *Straus*, 201 Fed. 99, 100; *Rubber Co.* v. *Devoe & Reynolds Co.*, 233 Fed. 150, 156; *International Silver Co.* v. *Rogers Corporation*, 66 N. J. Eq. 129; 38 Cyc. 775–777, 780.

The history of the law of unfair competition shows a steady broadening from the protection of the exclusive property right in a trade mark to the protection of the good will in a name against those who seek by borrowing the name to which it is attached to use it for themselves to the loss of the original user. As this development of the law has progressed, the importance of the element of the public's interest in not being imposed upon has increased as that of the individual who invokes the court's action has receded. *Estes & Sons* v. *Frost Co.,* 176 Fed. 338; *Trinidad Asphalt Co.* v. *Standard Paint Co.,* 163 Fed. 977, 980, affd. 220 U. S. 446; *Pillsbury-Washburn Flour Mills* v. *Eagle,* 86 Fed. 608; *Kinney* v. *Basch,* 16 Am. Law Reg. (N. S.) 596.

Misbranding is a defense, as a fraud on the public. *Worden* v. *California Fig Syrup Co.,* 187 U. S. 516, 528; *Church* v. *Proctor,* 66 Fed. 240.

The public is entitled to know what it gets. *Pillsbury* v. *Pillsbury-Washburn Flour Mills,* 64 Fed. 841, 848; *Prince Mfg. Co.* v. *Prince Metallic Paint Co.,* 135 N. Y. 24, cited with approval in *Worden* v. *California Fig Syrup Co., supra.*

Inveteracy of fraudulent practice is only an aggravation.

*Mr. Melville J. France,* with whom *Mr. Henry P. Molloy* was on the brief, for respondent.

Findings of fact, which are the basis of the conclusion of law of the Commission, are not supported by the evidence in some instances and in others omit vital matters contained in its proof, which the Commission conveniently seeks to ignore.

" Merino ", as applied to underwear, has for more than half a century meant a combination of cotton and wool. Webster's New International Dictionary; Murray's New English Dictionary; Cole's Dictionary of Dry Goods (1892); Encyclopedia Britannica, 11th ed.; Treas. Dec.

No. 10736; *Greenleaf* v. *Worthington*, 26 Fed. 303; The Knit Underwear Industry, p. 16, Miscellaneous Series No. 32, Department of Commerce, Bureau of Foreign and Domestic Commerce; The Hosiery Industry, p. 14, Table 5, Miscellaneous Series No. 31, Bureau of Foreign and Domestic Commerce; Thirteenth Census, 1910, Vol. X, p. 79.

There is nothing in the case which can in any fairness sustain a finding that, as to a retailer, the term " merino " carried the representation that the garment was all wool.

To the same degree such a finding is unwarranted as to the ultimate consumer, with whom it must be remembered this petitioner had no dealings.

The Commission cannot ignore a matter which is vital to the determination of the issue. *Curtis Publishing Co.* v. *Federal Trade Commission*, 270 Fed. 881, 911.

The Commission found that the respondent is a knit underwear manufacturer; that it sells and ships its product to retailers throughout the United States and uses labels containing the word " merino " on its boxes but not on its garments, where the garment so sold is not composed wholly of wool but is part wool and part cotton; and that the word " merino " is used by manufacturers of yarn and knit underwear and generally by jobbers and retailers as a trade term meaning a combination of cotton and wool.

The Commission has therefore found as a fact that in the industry in which the respondent must find its competitors and among those to whom it sells its product, " merino " means and is used to define a garment made of cotton and wool. In so labeling its product, there is no fraud, no deception and absolutely nothing unfair. When a term is used, which is general in its use, which is generally used by manufacturers, jobbers and retailers in the knitwear industry, to describe exactly the kind of garment which the respondent makes, wherein lies the unfair method of competition?

The respondent and its competitors sell to retailers and jobbers. It is not engaged in competition in selling to the purchasing public—its field of operation is that of jobbers and retailers. They, according to the Commission's finding, " generally " used the term " merino " just as does this respondent. But further, can. this respondent be penalized and condemned for the ignorance of those whom the Commission has discovered? The respondent was using the term " merino " in accordance with correct usage and definition. What authority has the Commission to brand this respondent as engaging in an unfair method of competition because of the ignorance of a salesman or the dishonesty of a tradesman?

The Commission is without jurisdiction over the facts of this case. Misbranding of goods is not " unfair competition."

The purpose behind the act was the regulation of competition. Report, Senate Committee on .Interstate Commerce, June 13, 1914, 63d Cong., 2d sess., No. 597, p. 10.

The phrase " unfair methods of competition " has been interpreted and defined by the courts. *Sears, Roebuck & Co.* v. *Federal Trade Commission,* 258 Fed. 407; *Federal Trade Commission* v. *Gratz,* 258 Fed. 314; and the many cases cited in *Kinney-Rome Co.* v. *Federal Trade Commission,* 275 Fed. 665.

First and foremost, therefore, there must be actual competition before there can be any unfair competition. In the case at bar there is no competition in the use of the word " merino." It has been used in the knitgoods industry for more than half a century to define a fabric made of cotton and wool. It never has been used to define an. all wool garment. See *Federal Trade Commission* v. *Gratz,* 253 U. S. 421, 427.

While the argument has been based upon a consideration of the term " merino," it applies with full force and effect to every term which the petitioner employed and which the Commission has condemned.

*Mr. Frank F. Reed* and *Mr. Edward S. Rogers,* by leave of court, filed a brief as *amici curiae.*

*Mr. Daniel Davenport, Mr. Morten Q. Macdonald* and *Mr. Walter Gordon Merritt,* by leave of court, filed a brief as *amici curiae.*

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The Winsted Hosiery Company has for many years manufactured underwear which it sells to retailers throughout the United States. It brands or labels the cartons in which the underwear is sold, as "Natural Merino", "Gray Wool", "Natural Wool", "Natural Worsted", or "Australian Wool". None of this underwear is all wool. Much of it contains only a small percentage of wool; some as little as ten per cent. The Federal Trade Commission instituted a complaint under § 5 of the Act of September 26, 1914, c. 311, 38 Stat. 717, 719, and called upon the company to show cause why use of these brands and labels alleged to be false and deceptive should not be discontinued. After appropriate proceedings an order was issued which, as later modified, directed the company to " cease and desist from employing or using as labels or brands on underwear or other knit goods not composed wholly of wool, or on the wrappers, boxes, or other containers in which they are delivered to customers, the words 'Merino', 'Wool', or 'Worsted', alone or in combination with any other word or words, unless accompanied by a word or words designating the substance, fiber, or material other than wool of which the garments are composed in part (*e. g.,* 'Merino, Wool, and Cotton'; 'Wool and Cotton'; 'Worsted, Wool, and Cotton'; 'Wool, Cotton, and Silk'), or by a word or words otherwise clearly indicating that such underwear or other goods is not made wholly of wool (*e. g.,* part wool)."

A petition for review of this order was filed by the company in the United States Circuit Court of Appeals for the Second Circuit. The prayer that the order be set aside was granted; and a decree to that effect was entered.[1] That court said: "Conscientious manufacturers may prefer not to use a label which is capable of misleading, and it may be that it will be desirable to prevent the use of the particular labels, but it is in our opinion not within the province of the Federal Trade Commission to do so." 272 Fed. 957, 961. The case is here on writ of certiorari. 256 U. S. 688.

The order of the Commission rests upon findings of fact; and these upon evidence which fills three hundred and fifty pages of the printed record. Section 5 of the act makes the Commission's findings conclusive as to the facts, if supported by evidence.

The findings here involved are clear, specific and comprehensive: The word "Merino" as applied to wool "means primarily and popularly" a fine long-staple wool, which commands the highest price. The words "Australian Wool" mean a distinct commodity, a fine grade of wool grown in Australia. The word "wool" when used as an adjective means made of wool. The word "worsted" means primarily and popularly a yarn or fabric made wholly of wool. A substantial part of the consuming public, and also some buyers for retailers and sales

---

[1] The original order of the Commission was based on findings which rested upon an agreed statement of facts. The petition for review urged, among other things, that the agreed statement did not support the findings. Thereupon the Commission moved in t  Court of Appeals that the case be remanded to the Commission fo. additional evidence as provided in the fourth paragraph of § 5 of the act. Under leave so granted the evidence was taken; and modified findings of fact were made. The modified order was based on these findings. It is this modified order which was set aside by the Court of Appeals; and we have no occasion to consider the original order or the proceedings which led up to it.

people, understand the words "Merino", "Natural Merino", "Gray Merino", "Natural Wool", "Gray Wool", "Australian Wool" and "Natural Worsted", as applied to underwear, to mean that the underwear is all wool. By means of the labels and brands of the Winsted Company bearing such words, part of the public is misled into selling or into buying as all wool, underwear which in fact is in large part cotton. And these brands and labels tend to aid and encourage the representations of unscrupulous retailers and their salesmen who knowingly sell to their customers as all wool, underwear which is largely composed of cotton. Knit underwear made wholly of wool, has for many years been widely manufactured and sold in this country and constitutes a substantial part of all knit underwear dealt in. It is sold under various labels or brands, including "Wool", "All Wool", "Natural Wool" and "Pure Wool", and also under other labels which do not contain any words descriptive of the composition of the article. Knit underwear made of cotton and wool is also used in this country by some manufacturers who market it without any label or marking describing the material or fibres of which it is composed, and by some who market it under labels bearing the words "Cotton and Wool" or "Part Wool." The Winsted Company's product, labeled and branded as above stated, is being sold in competition with such all wool underwear, and such cotton and wool underwear.

That these findings of fact are supported by evidence cannot be doubted. But it is contended that the method of competition complained of is not unfair within the meaning of the act, because labels such as the Winsted Company employs; and particularly those bearing the word "Merino", have long been established in the trade and are generally understood by it as indicating goods partly of cotton; that the trade is not deceived by them; that there was no unfair competition for which another

manufacturer of underwear could maintain a suit against the Winsted Company; and that even if consumers are misled because they do not understand the trade signification of the label or because some retailers deliberately deceive them as to its meaning, the result is in no way legally connected with unfair competition.

This argument appears to have prevailed with the Court of Appeals; but it is unsound. The labels in question are literally false, and, except those which bear the word "Merino", are palpably so. All are, as the Commission found, calculated to deceive and do in fact deceive a substantial portion of the purchasing public. That deception is due primarily to the words of the labels, and not to deliberate deception by the retailers from whom the consumer purchases. While it is true that a secondary meaning of the word "Merino" is shown, it is not a meaning so thoroughly established that the description which the label carries has ceased to deceive the public; for even buyers for retailers, and sales people, are found to have been misled. The facts show that it is to the interest of the public that a proceeding to stop the practice be brought. And they show also that the practice constitutes an unfair method of competition as against manufacturers of all wool knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their product truthfully. For when misbranded goods attract customers by means of the fraud which they perpetrate, trade is diverted from the producer of truthfully marked goods. That these honest manufacturers might protect their trade by also resorting to deceptive labels is no defense to this proceeding brought against the Winsted Company in the public interest.

The fact that misrepresentation and misdescription have become so common in the knit underwear trade that most dealers no longer accept labels at their face value, does not prevent their use being an unfair method of competition.

A method inherently unfair does not cease to be so because those competed against have become aware of the wrongful practice. Nor does it cease to be unfair because the falsity of the manufacturer's representation has become so well known to the trade that dealers, as distinguished from consumers, are no longer deceived. The honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument, which enables the retailer to increase his own sales of the dishonest goods, thereby lessening the market for the honest product. That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition.[1] And trade-marks which deceive the public are denied protection although members of the trade are not misled thereby.[2] As a substantial part of the public was still misled by the use of the labels which the Winsted Company employed, the public had an interest in stopping the practice as wrongful; and since the business of its trade rivals who marked their goods truthfully was necessarily affected by that practice, the Commission was justified in its conclusion that the practice constituted an unfair method of competition; and it was authorized to order that the practice be discontinued.

*Reversed.*

Mr. Justice McReynolds dissents.

---

[1] *Von Mumm* v. *Frash*, 56 Fed. 830; *Coca Cola Co.* v. *Gay-Ola Co.,* 200 Fed. 720, 722; *New England Awl & Needle Co.* v. *Marlborough Awl & Needle Co.,* 168 Mass. 154, 155.

[2] *Manhattan Medicine Co.* v. *Wood,* 108 U. S. 218; *Worden* v. *California Fig Syrup Co.,* 187 U. S. 516, 538.