## COCA–COLA CO. v. DIXI–COLA LABORA-TORIES, Inc., et al.

### No. 198.

District Court, D. Maryland.
Feb. 27, 1940.

Brown & Brune (by Hilary W. Gans and Charles Ruzicka), of Baltimore, Md., Spalding, Sibley, Troutman & Brock (by Robert B. Troutman), of Atlanta, Ga., and Nims & Verdi (by Harry D. Nims and P. E. Williamson, Jr.), of New York City, for plaintiff.

W. Hamilton Whiteford and Harvey C. Bickel, both of Baltimore, Md., and J. S. Mead, of Birmingham, Ala., for defendants.

WILLIAM C. COLEMAN, District Judge.

This is a trade-mark and unfair competition case brought by plaintiff against three corporations, Dixi-Cola Laboratories, Inc., MarBert Products, Inc., and Apola Extract & Syrup Corporation, and eleven individual defendants.

The bill of complaint charges all of the defendants with infringement of plaintiff's trade-mark "Coca-Cola" by the sale of defendants' products under the names Dixi-Cola, MarBert-Cola, MarBert The Distinctive Cola, Apola-Cola, Lola-Kola, Kola and May-Cola. The defendants are also charged with being guilty of unfair competition by simulating plaintiff's products, and by causing dealers to substitute and to pass off defendants' products for plaintiff's products.

The defendants deny both the charge of trade-mark infringement and unfair competition with respect to all of their products. However, at the trial, counsel for defendants abandoned any right to continue to use the name "Apola-Cola", and there is little, if any, evidence respecting the use of the name "Lola-Kola" or "May-Cola" by any of the defendants.

The defendant MarBert Products, Inc., manufactures a concentrate out of which the beverages Dixi-Cola and MarBert Cola are made, Dixi-Cola Laboratories, Inc., purchasing the concentrate from the MarBert Products, Inc., and, in turn, reselling it to its distributors. Dixi-Cola is sold to the consumers in bottles only, but MarBert-Cola is sold not only as a concentrate and as a bottled drink, but also as syrup which is purchased direct by fountain dispensers. These latter sales, however, represent only about 10 per cent of the gross business. The bottling is done by so-called independent bottlers, that is, bottlers who bottle other products and who have the right to, and do bottle and distribute the concentrate to a large extent under various names, as well as under the name MarBert-Cola. The Apola Extract & Syrup Company is a New York corporation no longer doing business, the MarBert Products, Inc., having purchased its assets several years ago, but never having operated it. MarBert Products, Inc., and the Dixi-Cola Laboratories, Inc., are domiciled in Baltimore and have little separate identity. Their places of business are in the same building, which, being on a corner, however, has enabled the companies to use, as they do, different addresses. The various individual defendants are all either officers, salesmen or representatives in some capacity of the MarBert Products, Inc., the defendant, R. W. Kruse, being the President of both companies.

Reduced to concrete form, the plaintiff seeks relief of two kinds: First, an injunction against the use by the defendants of the word "Cola" as a terminal or suffix to the prefixes now used by the Defendants as part of their trade names, or to any other prefix; and, second, an injunction against the sale by the defendants of any of their products to the consumer except in bottle form, unless the color of such products is changed from the brown, now virtually identical with that of Coca-Cola, to some other color distinctively different.

The defendants' answer to these two claims for relief can be summarized as follows: First, as to the matter of alleged infringement of the trade-mark, a denial that in the name "Coca-Cola" plaintiff has a valid trade-mark because, (a) the word is merely descriptive of the ingredients of plaintiff's product; (b) registration of the name "Coca-Cola" under the Act of 1905, 15 U.S.C.A. § 81 et seq., was accomplished by fraudulent misrepresentation; (c) the word "Cola" has become a generic term for a class of drinks, and plaintiff cannot monopolize its use; and (d) plaintiff has abandoned any right which it might otherwise have had to monopolize the use of the word "Cola" by acquiescing, over a long period of time, in its use in various forms.

On the question of unfair competition, defendants assert, first, that there is and has been no confusion between the product of the plaintiff and their own product for

which they should be held responsible; and, second, that they have sold their product in good faith, and are not responsible for unfair competitive practices of tradesmen with whom they have no real privity, and whom they have not aided or abetted in such practices.

■ We turn first to the question of the validity of the trade-mark "Coca-Cola." This is no longer an open question. The Supreme Court in Coca-Cola Company v. Koke Company, 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189, set it at rest in 1920, as did also the Circuit Court of Appeals for this Circuit, a little later, in Coca-Cola Company v. Old Dominion Beverage Corporation, 271 F. 600. The Supreme Court in the "Koke" case said, 254 U.S. at pages 145, 146, 147, 41 S.Ct. at page 113, 65 L.Ed. 189:

"It appears that after the plaintiff's predecessors in title had used the mark for some years it was registered under the Act of Congress of March 3, 1881 [c. 138], (21 Stat. 502), and again under the Act of February 20, 1905, c. 592, 33 Stat. 724 [15 U.S.C.A. § 81 et seq.]. Both the Courts below agree that subject to the one question to be considered the plaintiff has a right to equitable relief. Whatever may have been its original weakness, the mark for years has acquired a secondary significance and has indicated the plaintiff's product alone. * * * The name now characterizes a beverage to be had at almost any soda fountain. It means a single thing coming from a single source, and well known to the community. It hardly would be too much to say that the drink characterizes the name as much as the name the drink. In other words 'Coca-Cola' probably means to most persons the plaintiff's familiar product to be had everywhere rather than a compound of particular substances. Although the fact did not appear in United States v. Coca-Cola Co., 241 U.S. 265, 289, 36 S.Ct. 573, 60 L.Ed. 995, Ann.Cas.1917C, 487, we see no reason to doubt that, as we have said, it has acquired a secondary meaning in which perhaps the product is more emphasized than the producer but to which the producer is entitled. * * *

"The product including the coloring matter is free to all who can make it if no extrinsic deceiving elcment is present. * * *" (Italics inserted)

A few months later, in the Old Dominion Beverage Corporation case, the Circuit Court of Appeals for this Circuit said, in holding that the name "Taka-Kola" in-

fringed, 271 F. at page 601: "Plaintiff's trade-mark 'Coca-Cola' is duly registered under the ten-year proviso of the federal trade-mark law (Comp.St. § 9490 [15 U.S.C.A. § 85]). It is therefore immaterial that it may once have been descriptive or that to a degree it may be so still. * * * The Supreme Court has very recently overruled the contention that, because of what is said to have been or to be its deceptive character, plaintiff may not be heard to complain of its infringement. Coca-Cola v. Koke Co., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. [189], decided December 6, 1920."

Defendants stress, in support of their position, the case of Warner & Company v. Lilly & Company, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161, in which it was held that the names "Coco-Quinine" and "Quin-Coco", applied to a liquid preparation of quinine in combination with chocolate and other things, cannot be appropriated as trade-marks, because these names are merely descriptive of the ingredients, qualities, or characteristics of an article of trade. This case, decided several years after the Coca-Cola case, does not cite that case. This is significant and very indicative of the obvious distinction between the articles involved in the two cases. In the Quinine case both of the syllables of both of the names involved were, as the Court found, merely descriptive of the primary ingredients of the article itself, namely, quinine and chocolate. There was merely an attempt to color and to make more palatable a long-established medicine, namely, quinine, by adding chocolate. In the case of Coca-Cola, on the other hand, it is not true to say that the coca leaf and the cola nut represent the basic ingredients because, as a matter of fact, the amounts of coca and cola extract are relatively very small —the exact percentages of each being kept secret and not capable of ascertainment by laboratory analysis, of the beverage as marketed—and the basic ingredients are sugar, phosphoric acid and caffeine,—the latter being in relatively small percentage, comparable to the various flavoring materials that are added.

■ Evidence in the present case stands without contradiction that no such thing as a "cola" beverage was known or spoken of prior to the advent of Coca-Cola on the market, which first occurred in 1886 when one Pemberton introduced and sold as a beverage his so-called "Coca-Cola Syrup and Extract," although separate extracts

of coca leaves and cola nuts had previously been known and used by druggists in compounding medicines; and in 1887 Pemberton, who was the plaintiff company's predecessor in title, registered his "Coca-Cola Syrup and Extract." Thus, defendants' argument is untenable that "Cola" antedated "Coca-Cola" as a generic term for a certain class of soft drinks free to all who desire to use it as part of a trade name, just like the words "ginger-ale", "sarsaparilla", and "root-beer." Since Coca-Cola appeared, there has been a veritable flood of drinks of this type, as evidenced by the fact that there have been no less than 143 registrations in the United States Patent Office of names embodying the word "cola" as a suffix. But it is idle to argue that Coca-Cola's competitors can capitalize a condition which has arisen entirely as a consequence the creation and marketing of Coca-Cola. There is absolutely no evidence in the present case that plaintiff has ever abandoned its right to be protected in the use of its name, or that it has ever acquiesced in the use of infringing marks. Abandonment is primarily a question of intention. It has been disclosed in the present case that the Coca-Cola Company for many years had been, and still is, contesting alleged infringements by competitors at the rate of approximately one case a week.

There are four factors which the defendants in the present case constantly play up and rely upon: First, what we have already been considering, namely, the use of the suffix "cola"; second, copying the color of Coca-Cola; third, offering the consumer in bottle form a larger quantity of their beverages for the same price than does Coca-Cola; and, fourth, selling their concentrates to the jobber and bottler at a cheaper price.

In Coca-Cola Company v. Old Dominion Beverage Corporation, supra, where, as already stated, the mark "Taka-Kola" was held to infringe, the Court had the following to say, (271 F. at page 603, 604), which is most pertinent to the present case: "May defendant employ, for the sole purpose of bringing its wares speedily and cheaply into notice, a variant of plaintiff's trade-mark so close as to suggest the latter to every one, thereby turning to its own profit the reputation which the plaintiff has built up through many years of skill and effort, and at the cost of millions expended in advertising its goods under its mark? It may tell the thirsty that its drink is not only as good as Coca-Cola, but that it believes it to be in fact the same thing; but can it do so by using plaintiff's trade-mark to plaintiff's hurt?"

The degree of resemblance of an alleged infringing mark to a plaintiff's mark either in appearance or in pronunciation is far from being the sole test. Indeed, this court (Judge Soper) fourteen years ago enjoined the use of the name "Champion-Cola",—a name which bears to the eye no resemblance to Coca-Cola, when appearing in conventional block type, or euphoniously, except for the suffix "Cola". See The Coca-Cola Company Inc. v. Phillips Brothers, et al.,[1] Equity Docket No. 818. Likelihood of confusion in the public mind as to the source of the competing product is also a basic factor. In the present case there is extensive evidence of such confusion.

In Coca-Cola Company v. Gay-Ola Company, 6 Cir., 200 F. 720, at page 723, where the name "Gay-Ola" was involved, the Court said: "It is first to be observed that defendant is at the best on a narrow ground of legality. The name which it has adopted does not negative an intent to confuse."

The following excerpts from the opinion of the Exchequer Court of Canada in the recent case of Coca-Cola Company of Canada, Ltd., against Pepsi-Cola Company of Canada, Ltd., decided in July, 1938 (1938 Ex.C.R. p. 263), are believed to be most pertinent to the present controversy. Full recognition is had of the fact that this case did not combine, with the technical issues under the Canadian statutes as to trade-mark registration, a passing-off action, and that, unlike the present case, there was no evidence that any one had been misled; also, that the Exchequer Court's decision has been reversed on appeal by the Supreme Court of Canada (1940, L.D.L.R. 161), and the issues were greatly narrowed. We understand the case is on appeal to the Privy Council. Nevertheless, regardless of the ultimate outcome of that case, we believe the reasoning of the lower court, on the phase of the case pertinent to the issue here, to be the more sound. Justice McLean, President of the Exchequer Court, said (pp. 289–293): "It puts a great strain upon one's credulity to believe that the registration and use of so many of the marks mentioned, in the United States and Canada, in respect of

---

[1] No opinion for publication.

840

low-priced beverages which so often look much alike, was not intended for that purpose [obtaining some business advantage or advertising from the established position of Coca-Cola in the market, at the expense of Coca-Cola]. All this could hardly be accidental. I can hardly believe that the many persons adopting as a trade-mark, for beverages of the character in question, a compound word, or any two words, comprising either the word 'Coca', or the word 'Cola', or variants of such words, did not do so with the expectation of reaping some advantage from the wide acquaintance of consumers with Coca-Cola; and variants of registered marks are not usually looked upon with favor by the Courts. If one person can do this with immunity, then a thousand may do it, surely an undesirable situation from the public standpoint alone, and one which, in my opinion, accentuates the inherent weakness of the contention here advanced on behalf of the defendant in respect of the charge of infringement."

Continuing, the Canadian Justice said: "When I look over all the marks registered or used in Canada, and in the United States, for beverages of the character in question, I am not inclined to think that the registrants or users were really so much distressed over making it certain and clear that their potential patrons would be satisfied that their beverage was made from the exotic 'Cola' or 'Kola' nut, or flavored therewith, or that they would get a 'Cola drink', as they were to select a name for their beverage that might quickly and cheaply be popularized and made known; and in that state of mind, I think, the selections were made as close to that of the plaintiff's as they respectfully could go. If registrants and users of such marks desired the public to clearly understand that their beverage was meritorious and of their own manufacture, why would they not adopt a wholly new and distinctive trade-mark, one that was so entirely free from resemblance to the plaintiff's mark that no one would ever harbour the idea of infringement? Why should all these trade-marked beverages follow in the wake of the entry of the plaintiff's beverage on the market, and expand the numbers with the years? To me, all this has a cumulative effect adverse to the defendant's contention, and lends weight to the contention that Pepsi-Cola, and others of such marks, were registered and put into use in Canada for the purpose of obtaining some commercial advantage from the long acquaintance of the public

with the plaintiff's beverage. My conclusion is that there is infringement here, and that barring other points of defense the plaintiff is entitled to succeed. * * * Further, I do not think that the plaintiff's mark is descriptive or misdescriptive. I do not see how it can be said that the compound word 'Coca-Cola' is descriptive of the plaintiff's beverage, largely composed of carbonated water, even if it contains a flavouring of Coca leaves or the Kola nut, which indeed has not even been properly established here if it were a vital point. The plaintiff's syrup, 'Coca-Cola', is made according to some secret formula, and which was not disclosed. As used, the mark indicates, and has come to mean, merely the name of the beverage manufactured by the plaintiff. It has no other name. As used, I think it is but a coined word mark, and is not 'clearly descriptive' of the character of the beverage. I should think that the words comprising the plaintiff's mark were unknown in this country, at least as the name of a beverage, before the plaintiff's predecessor in business came to use the same for that purpose; and I doubt if it would occur to any one that the beverage was made from Coca-leaves and the Kola nut both of which products would be unknown to most people in Canada at the date of the adoption of the mark as the name of a beverage. It seems to me that 'Coca-Cola' is but a word mark adapted to distinguish a beverage made by the plaintiff, and in the eyes of the general public is meaningless except to distinguish that beverage and its origin, and it is not 'clearly descriptive' of the character of the beverage."

In the case of Nashville Syrup Company v. Coca-Cola Company, 215 F. 527, Ann. Cas.1915B, 358, a decision of the Sixth Circuit Court of Appeals where the name "Fletcher's Coca-Cola" was held to infringe, the Court, in stating the facts, said, 215 F. at page 528, and this is peculiarly applicable to the present case: "Coca is a South American shrub, from the leaves of which cocaine, among other substances, is obtained; the cola tree grows in Africa, and from its nuts caffeine may be extracted. The use of these leaves and these nuts by the natives in their respective countries, and for the supposed stimulating qualities, had long been known in this country, and before 1887 extracts respectively from coca leaves and from cola nuts had found a place in the pharmacopœia. There was little popular knowledge concerning them. The ex-

tracts were used only by druggists in compounding medicine. In 1887 Pemberton, an Atlanta druggist, registered in the Patent Office a label for what he called 'Coca Cola Syrup and Extract.' The plaintiff below, the Coca Cola Company, was organized as a corporation in 1892, and acquired Pemberton's formula and label. Since that time, it has continuously manufactured and sold a syrup under the name, 'Coca Cola'; and, used as a basis for carbonated drinks, the syrup, under this name, has had a large sale in all parts of the country. In 1893 the Coca Cola Company (herein called plaintiff) registered the name 'Coca Cola' as a trade-mark, and again in October of 1905, and pursuant to the act of February 20, 1905, the name was registered by plaintiff as a trade-mark under the 10-year proviso of that act."

In the course of its opinion, the Court said, 215 F. at page 531:

"We think it clear that whether the claimed trade-mark is so descriptive of something else as to be deceptive must be decided as of the time of adoption. It cannot be that rights once lawfully acquired by exclusive appropriation can be defeated by subsequent progress of public knowledge regarding some other substance of similar name. It is undisputed that during the period shortly after 1892, while this name was coming into public knowledge in connection with plaintiff's product, little or nothing was popularly known about either coca leaves or cola nuts, although existing technical or cyclopedic publications gave information. It is not important whether Pemberton's original form, 'Coca Cola Syrup and Extract', was so descriptive as to be deceptive if applied to a compound not composed mainly of these ingredients. The name in which trademark rights have been acquired is the compound name 'Coca Cola', and this name may not, for all purposes, be the same as if it was 'Extract of Coca and of Cola'. Neither of these words alone had any absolute complete meaning, but when the words were put together to make the compound term, the ambiguity of meaning was intensified. If coca was spoken of, the reference might be to the leaves, or to a decoction or to an extract; 'cola' might refer to the nuts or to a powder or to a paste or a fluid; and so, when the public first saw the name 'Coca Cola', it could not know, as we said in the accompanying case, whether the substance was medicine, food, or drink, or whether it was intended to swallow, smoke, or chew. One who had all the existing available information could only infer that the new substance, whatever it was, had some connection with these two foreign things. The case would be somewhat different if each of the two named elements was itself definite and certain, but neither is. To illustrate by more common substances: Sage is a shrub, used in various ways; the almond is a nut, eaten raw or prepared in numerous methods. The compound name 'Sage-Almond', as a label, would convey a very indefinite idea, if any, as to what would be found when the package was opened; and, if we assume that 'Sage-Almond' turned out to be a drink in connection with which sage leaves and almonds had been used, we have, in this illustration, a close analogy to Coca Cola; yet this name, applied to a soda fountain beverage, would not deceive the public into supposing that it contained all the virtues of sage tea and all of the nourishment of the almond nut meats. Such an article could honestly enough carry the supposed name 'Sage-Almond'; And after 20 years exclusive use of the name it would not still be common property. A newcomer might rightfully sell (e. g.) 'Sage Tea with Almond Flavor'; he might not take the peculiar, precise, and really arbitrary compound name.

"Plaintiff's counsel say, and so far as we see accurately say: 'The use of a compound name does not necessarily * * * indicate that the article to which the name is applied contains the substances whose names make up the compound. Thus, soda water contains no soda; the butternut contains no butter; cream of tartar contains no cream; nor milk of lime any milk. Grapefruit is not the fruit of the grape; nor is bread fruit the fruit of bread; the pineapple is foreign to both the pine and the apple; and the manufactured food known as Grape Nuts contains neither grapes nor nuts.' "

Of all reported, contested cases, our attention has been called to only one in which the alleged infringing name has not been enjoined. That is Coca-Cola Company v. Carlisle Bottling Works, 43 F.2d 119, certiorari denied, 282 U.S. 882, 51 S.Ct. 86, 75 L.Ed. 778, another decision of the 6th Circuit Court of Appeals, upon which counsel for defendants place much reliance, and in which the name "Roxa-Kola" was held not to infringe. But there, circumstances

of unfair competition, such as we have in the present case, were absent, and the court was greatly influenced by a finding of long acquiescence on the part of plaintiff in defendant's use of its mark. In short, we cannot accept this decision as laying down any principle that should be followed, apart from the special facts then under considera- tion.

Coming now to the question of un- fair competition per se, apart from the question of technical trade-mark, the rec- ord in the present case is replete with in- stances of substitution or attempted sub- stitution; with deliberate mis-use of con- tainers for wholesale distribution of de- fendants' products, and mis-use of bottle caps. Distributors of defendants' product, with the knowledge and acquiescence of de- fendants, sold defendants' product in con- tainers bearing no trade-mark label or other means of identification and also in contain- ers bearing plaintiff's corporate name; and defendants and their distributors sold de- fendants' product in refilled containers, still painted with the distinctive red color, used originally by plaintiff in distributing its own product. We will not take the time to an- alyze further these various instances. Sum- marized, the best answer that the defendants have been able to give to this is that they are not responsible for certain instances of un- warranted conduct on the part of certain of their distributors or agents, and that as soon as they were apprised of what had occurred, they made every reasonable effort to stop it.

We may assume that this is to be accept- ed as true with respect to a few instances, but with respect to many other instances the defendants themselves have either ad- mitted knowledge of, and responsibility for what was done, or by their evasive answers may be considered as having encouraged or at least winked at the unfair practices of substitution. When, as a result of plaintiff's charges of unfair practices on the part of defendants' distributors in New York City, defendants ordered these practices discontinued, their volume of business drop- ped very materially. In this connection it is very pertinent to point out that the volume of gross sales of MarBert Products, Inc. increased from $40,000 in 1938 to ap- proximately $90,000 in 1939, but that in neither year did the company spend more than approximately $3,000 in advertising, as against more than $7,000,000 spent by the Coca-Cola Company in each of these years, for this purpose.

Reliance has been placed by defendants' counsel upon cases such as that involving the name "Aspirin", Bayer Co. Inc. v. Unit- ed Drug Co., D.C., 272 F. 505. Without analyzing this case in detail, suffice it to say that it is clearly distinguishable, if for no other reason than that it was concerned with a patent drug that the patentee-manu- facturer allowed to be sold widely, for years, under the trade name, with nothing to indicate that it was of its own manufac- ture—a direct contrast to what has always been done by the Coca-Cola Company.

This Court is not unmindful, of course, of the fact, already referred to, that there have been a great number of registra- tions granted by the United States Patent Office, as well as in Canada, of names using the suffix "Cola", many of which more closely resemble the name "Coca-Cola", than do the names here in controversy. But registration under our Trade-mark statutes confers no new rights to the mark claimed, nor any greater rights than already exist at common law without registration. That is to say, registration does not create a trade-mark. It is not essential to its val- idity. By express provision of the Act of 1905 (Section 16), 15 U.S.C.A. § 96, reg- istration is prima facie evidence of owner- ship; and although the Act does not pro- vide that registration is prima facie evi- dence of the trade-mark's validity, since the Patent Office is not authorized to register anything but a trade-mark, registration in- volves consideration by the Commissioner of Patents whether the device, for which registration is sought, may be the subject of exclusive appropriation as a trade-mark; and, therefore, the Commissioner's decision regarding that question is entitled to respect as being prima facie correct. Planten v. Gedney, D.C., 221 F. 281; Id., 2 Cir., 224 F. 382; Id., 2 Cir., 228 F. 338. In short, the Act does not directly operate to grant a monopoly to the registrant, but merely removes from words which had been ex- clusively used as a mark in interstate com- merce for ten years, the bar or disability caused by their descriptive or geographical character and makes them, after their regis- tration, subject to exclusive appropriation with the same effect, in the main, as if the disability had never existed.

In other words, it may be said that the principal advantages of registration are more practical than legal, namely, the regis- tration gives effectual *constructive* notice to the public of the claim to the trade-mark

and tends to give *actual* notice, since the proposed trade-mark must be published in the Official Gazette of the Patent Office. Also, the applicant for registration has the benefit of the examination of his mark by the Patent Office before it is registered and of the publication of it just mentioned, which tends to invite opposition if there be any, and therefore, to aid the determination of doubtful questions of validity. See Nims on Unfair Competition and Trade-Marks, 3rd Ed., pages 591, 592.

Thus, each case must be considered upon its own facts, and this court believes that in the present case the voluminous record presents an issue more clear-cut than has been heretofore presented in most, if not all, of the litigated cases involving use of the word "Cola", and, therefore, a fortiori is this true with respect to the mere ex parte registration proceedings in the Patent Office. Here it is appropriate to call attention to the fact that the Patent Office refused registration to Dixi-Cola, not on the broad principle here adopted, but because the prefix "Dixi" suggests the locale of origin of Coca-Cola.

We come, then, finally to the question whether or not plaintiff is entitled to the additional relief asked for, namely, that defendants shall not, unless they sell their products in bottles to consumers, give to their products the same color as Coca-Cola. We think that plaintiff is entitled to this relief. The weight of the credible evidence clearly indicates that the caramel used for coloring purposes by both plaintiff and defendants has no real functional value, and it is clear to this Court that there is no way of successfully avoiding the future probability of substitution except by changing the color, if defendants still desire to have their products dispensed to the consumer otherwise than in bottles, as they have the right to do. This is not tantamount to giving plaintiff a proprietary right in the particular brown color that it employs for its beverage. The testimony discloses that plaintiff has used this same, or substantially the same, color from the time that it first marketed its product, and since the use of caramel has no real functional value, it is only reasonable to conclude that the real purpose of defendants, in precisely matching colors, was to stimulate substitution—certainly where their product is sold to the public without identifying bottles or insignia.

In this connection it is quite significant, and greatly weakens the defendants' case, that they stress the value of their trade-marks in one breath, and in the next breath say that they are willing, as they have been, to let their bottlers take their products and dispense them under whatever labels their bottlers see fit to use. The answer given by defendants is that they cannot afford to have their own exclusive bottlers. That may be true; but that is a business question which cannot over-ride basic principles of law essential to the maintenance of fair competition.

The question of change of color was directly involved in the case of Coca-Cola Company v. Gay-Ola Company, supra. There the Court said, 200 F. at page 724: "The record justifies the conclusion that the color is 'nonfunctional'—to use the phraseology of the patent law. The bill alleges that Gay-Ola is 'artificially and unnecessarily' colored so as to look exactly like Coca Cola. The answer denies this in terms; but it goes on to say that the color is produced by caramel, which is in universal use for coloring purposes, and is used by complainant for coloring Coca Cola. There is here no claim that caramel serves any other purpose in either compound, except merely to give color, and saying that it is one of the 'component elements,' as one of the witnesses does, is saying nothing more. It follows that the adoption, not only of caramel, but of the selected amount of caramel, was for the main and primary purpose of making the two articles look just alike. In this connection it appears that there is a great variety of coloring materials open to the use of any manufacturer, and selections from which are used by other manufacturers."

In the second Gay-Ola case, Coca-Cola Co. v. Gay-Ola Co., 6 Cir., 211 F. 942, in which the Court considered certain questions arising in connection with the form of decree incident to the court's original decision, it was said, 211 F. at page 943: *"We cannot see how it is possible for this syrup, carrying what on the record must be called the guilty color, to be sold by the Gay-Ola Company, so that it loses title and control, and for the court at the same time to retain practical power to enforce against the Gay-Ola Company the existing restriction upon the ultimate form of sale.* Obviously, by establishing its own bottling works in different places, or by causing the bottling to be done by its agents, whose acts

**844**

are its acts, it can get its product on the market in bottled form; if such branches or agencies are impracticable, and the Gay- Ola Company must either change the color or abandon the business, this result must be charged to its fraudulent inception—to a 'congenital defect'. *We think the decree should absolutely prohibit sales by the Gay-Ola Company unless in the form prescribed for ultimate use.*" (Italics inserted.)

A good deal was said in the course of the trial about custom of the trade, and that jobbers, bottlers and retailers were not deceived by anything that defendants did, or omitted to do. Suffice it to say that *any* method of competition, inherently unfair, does not cease to be so because it becomes so well known to the trade that dealers, as distinguished from consumers, are no longer deceived by it. Federal Trade Commission v. Winsted Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729. To be sure, there is no evidence in the present case from consumers themselves that they were offered, when asking for Coca-Cola, defendants' product instead, and were told that it was the same thing. What was done, as the testimony discloses, was far more subtle, therefore, the more effective and the more to be condemned.

In conclusion, and to summarize, this Court believes that the plaintiff is entitled to the relief asked for, namely: First, an injunction preventing the defendants from using, as part of the name of their products, the word "Cola", regardless of whether the syllable placed in front of the word "cola" is like or unlike the syllable "Coca"—whether it looks like it, or when pronounced, sounds like it. This does not mean that the defendants cannot use the word "Cola" or the word "Coca", or both, separately, on their labels otherwise than as part of the name itself. They have a right to do that, provided they do not embody either of those words in the name itself, for the plaintiff has no proprietary right in either of these words, standing alone. For example, it would be entirely permissible for defendants' labels and advertisements to contain an explanatory statement, apart from the name, such as: "This beverage contains the extract of coca and of cola."

Second, and in addition to the aforegoing requirement as to the name, plaintiff is entitled to have the defendants enjoined from employing for their products the same color as that of Coca-Cola if defendants distribute, or permit their products to be distributed, or sold to the consumer other than in bottles.

Lastly, plaintiff is entitled to an accounting from the corporate defendants, and from Robert W. Kruse and Constantine A. Grivakis, individual defendants, for all damages sustained by the plaintiff and profits realized by said defendants by reason of infringement and unfair competition, and to its taxable costs.

A decree will be signed in accordance with the opinion just rendered.