296 F.2d 608
 BALTIMORE LUGGAGE COMPANY, a Maryland Corporation, and
Gertrude Holtzman and Samuel J. Holtzman,
individually and as officers of The
Baltimore Luggage Company, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 8382.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 16, 1961.
Decided Nov. 7, 1961.
 
 William J. Pittler, Baltimore, Md. (Robert L. Sullivan, Jr., and Sklar & Sullivan, Baltimore, Md., on the brief), for petitioners.
 Gerald Harwood, Atty., Federal Trade Commission, Washington, D.C. (James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, Federal Trade Commission, Washington, D.C., on the brief), for respondent.
 
 
 1
 Before SOPER and BRYAN, Circuit Judges, and BARKSDALE, District Judge.
 
 
 2
 BARKSDALE, District Judge.
 
 
 3
 After an administrative hearing, the Federal Trade Commission issued an order against the Baltimore Luggage Company, a Maryland Corporation, and Gertrude Holtzman and Samuel H. Holtzman, its controlling officers (hereinafter collectively referred to as 'Baltimore'), requiring Baltimore to cease and desist from a continuation of certain of its acts and practices alleged to be violative of the Federal Trade Commission Act. Feeling aggrieved by this order, Baltimore has filed its petition for review in this court.
 
 
 4
 The pertinent provisions of the Act are as follows:
 
 
 5
 '(Sec. 5)(a)(1). Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are (hereby) declared unlawful.' 66 Stat. 632 (1952), 15 U.S.C.A. 45(a)(1).
 
 
 6
 '(Sec. 5)(a)(6). The Commission is (hereby) empowered and directed to prevent persons, partnerships, or corporations, * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.' 66 Stat. 632 (1952), 15 U.S.C.A 45(a)(6).
 
 
 7
 '(Sec. 5) (c) * * * the findings of the Commission as to the facts, if supported by evidence, shall be conclusive.' 52 Stat. 113 (1938), 15 U.S.C.A. 45(c).
 
 
 8
 There is little, if any, controversy as to the facts. Baltimore Luggage Company manufactures luggage in the city of Baltimore, which it sells under the trade name of 'lady Baltimore', in eight different sizes and eight different colors, directly to retail dealers throughout the United States. The individual defendants are its officers, who formulate, direct and control its acts and practices. Each piece of luggage is shipped by Baltimore to the retail dealer with a printed ticket or tag attached, setting forth a retail price for that piece of luggage. The precise language appearing on a typical ticket or tag is as follows:
 
 
 9
 'Lady Baltimore Fashion Luggage Size 18' O'Nite Color: Coppertone Price: 12.95-*
 
 
 10
 *Subject to existing Federal & Sales Taxes'
 
 
 11
 During the period involved in this proceeding, the ticketed retail prices ranged from $12.95 plus tax for the smallest pieces to $21.95 plus tax for the largest pieces. Actually, during this period Baltimore's luggage was usually and regularly sold by numerous retailers, including those in the New York, Philadelphia, Washington and Baltimore trade areas, at a retail price of approximatelyn $2.00 lower than the ticketed price. The regular and customary retail price for Baltimore's luggage was approximately $2.00 lower than the ticketed price in areas throughout the country in which were located 387 of the approximately 1,276 retail outlets for Baltimore's laggage, which retail outlets accounted for approximately 37 1/2% of Baltimore's sales. Although Baltimore's pretickets were sometimes removed by the retailers who sold the luggage at less than the preticketed price when the luggage was put on sale, generally the retailers left Baltimore's tickets on the luggage. Some stores also exhibited cards furnished by Baltimore showing the same price as that printed on Baltimore's tickets. The hearing examiner found, and the Commissioner adopted his findings, that by preticketing its luggage, and in some instances also by furnishing customers with display cards showing retail prices, Baltimore represented that the prices on the tickets and cards were the usual and regular retail prices for its luggage, and that this representation was false in those trade areas where the luggage was usually and regularly sold at retail at approximately $2.00 less. The Commission, adopting the finding of its hearing examiner, further found that, in the areas in which Baltimore's luggage was usually and regularly sold for approximately $2.00 less than the preticketed price, Baltimore had placed in the hands of the retailers the means of deceiving purchasers into believing that the luggage was being offered at reduced prices lower than the regular retail prices. Although Baltimore contended that any representations as to the regular and usual price of its luggage should be judged on the basis of the price at which the luggage is sol throughout the country, rather than the price at which it is regularly and customarily sold in the trade areas where the preticketed price was higher than the actual price, the Commission rejected this contention and issued its order directing petitioners to cease and desist from:
 
 
 12
 '1. Representing, directly or by implication, by means of pre-ticketing or in any other manner, that any amount is the usual and regular retail price of merchandise when such amount is in excess of the price at which said merchandise is usually and regularly sold at retail in the trade area or areas where the representations are made.
 
 
 13
 '2. Furnishing to others any means or instrumentality by or through which the public may be misled as to the usual and customary prices of respondents' merchandise.
 
 
 14
 '3. Putting any plan into operation through the use of which retailers or others may misrepresent the usual and regular retail price of merchandise.'
 
 
 15
 Although Baltimore contends that this order is ambiguous and indefinite, we find no substance in this contention.
 
 
 16
 The Commission does not contend that for the manufacturer to place tickets on its products before delivering them to retailers indicating the retail purchase price, a practice known as 'preticketing', is illegal or deceptive per se. But the Commission does maintain, and Baltimore agrees, that manufacturers who preticket their products fictitiously are guilty of engaging in an unfair trade practice in violation of the Act. It was held in Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729, that the Commission might properly inhibit a manufacturer from placing labels on its merchandise fictitiously misrepresenting the material from which the merchandise was manufactured. And more to the point, it has recently been held in Clinton Watch Co. v. Federal Trade Commission, 7 Cir., 291 F.2d 838, that preticketing merchandise at fictitious and excessive prices, was an activity proscribed by the Act in order to protect the interest of the public. The court said (p. 840):
 
 
 17
 '* * * Petitioners are engaged in the manufacture of watches which are sold in interstate commerce to wholesale, mail order houses, to discount houses, and to retailers. A price tag is attached to each watch at the factory, reflecting a price substantially in excess of the normal and usual retail price. Ultimate purchasers of petitioners' products testified that they bought the watches at substantially lower prices han those indicated on the attached tickets. Preticketing at fictitious and excessive prices must be deemed to have the tendency of deceiving the public as to the savings afforded by the purchase of a product thus tagged as well as to the value of the product acquired. Petitioners' practice places a means of misleading the public into the hands of those who ultimately deal with the consumer. Notwithstanding the prevalence of these practices and the familiarity therewith among members of the trade, these activities are proscribed to protect the interest of the public. Federal Trade Commission v. Winsted Hosiery Co., 1922, 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729.
 
 
 18
 'Misrepresentation as to the retail value of merchandise by means of an attached, fictitious price and deception as to savings afforded by the purchase of the product at a substantially lower price than that indicated thereon constitute unfair methods of competition. Miresk Industries, Inc. v. Federal Trade Commission, 7 Cir., 1960, 278 F.id 337, 340, certiorari denied 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104; Harsam Distributors, Inc. v. Federal Trade Commission, 2 Cir., 1959, 263 F.2d 396, 397.'
 
 
 19
 Baltimore's principal contention is that: 'In order to sustain its allegation that the Petitioners (Baltimore), by the use of pretickets, misrepresent the usual and regular retail price of its luggage, the Respondent (the Commission) must prove, by substantial evidence, that the usual and regular price at which Petitioners' product is sold at retail, throughout the country, is substantially less than its preticketed price.' With this contention we do not agree. The evidence showed that Baltimore sold its luggage to 1,276 retail customers in cities located in 46 states and the District of Columbia. Of this number, 387 retailers in approximately twelve states sold this luggage at retail at substantially less than the preticketed prices. Sales to these 387 retail dealers represented 37.5% of Baltimore's total dollar volume sales. As to the preticketing in the 387 retail stores in which the retail prices charged were substantially less than the preticketed retail prices, the Commission has found as a fact that 'Respondent's purpose is self evident-- to make it appear to the store customers that the store was selling the luggage at approximately two dollars less than the regular retail price, and the customer would believe he or she was getting a reduced price. It is apparent that the respondent corporation was aware that its price tags were being used for deceptive purposes.'
 
 
 20
 No authorities have been cited to us, nor do we find any, which hold that, before the Commission may proscribe a deceptive practice on the part of a manufacturer which is widespread, it must be shown that the practice is not only widespread but universal.
 
 
 21
 The Commission has supplied us with copies of agreed orders entered in the proceedings In re Siegmund Werner, Inc., etc., Oct. 28, 1960, and In re Knight of Rest Products, Inc., etc., Sept. 13, 1960. Both of these orders required defendants to cease and desist from, inter alia, preticketing their merchandise with a retail price 'in excess of the price at which such product is usually and customarily sold at retail in the trade area or areas where the representations is made.'
 
 
 22
 It does not appear from these orders how widespread the deceptive preicketing had been, but the italicised language would seem to indicate that the deceptive preticketing was not universal, but only in certain areas.
 
 
 23
 We hold that the evidence here was ample to support the finding of the Commission that Baltimore's preticketing practice was deceptive to the extent indicated above, and fully justified the Commission's order requiring Baltimore to cease and desist from this practice. It is to be noted that the Commission's order does not proscribe Baltimore's practice of preticketing: the order only requires Baltimore to cease and desist from preticketing its merchandise with a retail price 'when such amount is in excess of the price at which said merchandise is usually and regularly sold at retail in the trade area or areas where the representations are made.'
 
 
 24
 Baltimore seeks to justify its preticketing practice by reference to the Automobile Information Disclosure Act, Public Law 85-506, July 7, 1958, 72 Stat. 325, 15 U.S.C.A. 1231-1233, which requires manufacturers of automobiles to place a label upon each new car delivered to a retailer showing 'the retail price of such automobile suggested by the manufacturer', together with the suggested retail price of accessories and other items of optional equipment attached to the automobile, and the transportation costs. While this Act does require a species of preticketing, it is not a statute of general application, but applies solely and specifically to the sale of new automobiles, and was intended to protect the public from fraudulent practices engaged in primarily by retail automobile dealers. The legislative history of this Act, 2 U.S.Code Congressional and Administrative News, 85th Congress 1958, p. 2902, in speaking of the purpose of the bill and the need for the legislation, sets out (pp. 2903, 2904, 2905):'The primary purpose of the bill is to disclose the manufacturer's suggested retail price of the new automobile (passenger car or station wagon) so that the buyer will know what it is. This information is not available now.
 
 
 25
 'The present-day buyer of a new automobile is usually completely bewildered and unable to find his way through the marketing jungle in which the automobile dealers have become involved.
 
 
 26
 'This bill will restore the confidence of the automobile buyer. The disclosure of the manufacturer's suggested retail delivered price will help to minimize the advertising extravagances indulged in by some automobile dealers.
 
 
 27
 'Need For Legislation
 
 
 28
 'Recently, the new car dealers have been plauged by unfair and unscrupulous marketing practices on the part of some dealers, which have been injurious to the new car dealers as a whole, injurious to the car manufacturers, and bewildering to the purchasers of new cars. These practices are what is called 'price packing' and misleading advertising. They have created chaos and confusion in the market place.
 
 
 29
 'Price packing is the practice of marking up or adding charges over and above the normal recognized markup from the wholesale price at which a dealer purchases a new automobile from a manufacturer. The pack in the price of the new car is, of course, offset by over-allowances on the trade-in value of the customer's used car. Much of the trouble caused by the pack has been the misconception, created in the minds of the public, as to the value of the used car in today's market, as well as the uncertainty of knowing what the new car is worth. The effect has been to confuse the public and to damage the automobile industry. Dealers who would like to do business on a fair, competitive basis have been forced to use such tactics in order to stay in business. Confusion, doubt, and suspicion have developed in the minds of the buying public which have retarded the sale of new cars, and have set off a chain reaction adversely affecting the entire automobile industry, and, in fact, our entire economu. * * *'
 
 
 30
 It is quite obvious that the Automobile Information Disclosure Act was enacted in the effort to remedy a situation peculiar to the automobile industry brought about by widespread fraudulent or deceptive practices principally indulged in by retailers. The Act does indicate that preticketing per se is not illegal, but the Commission does not so contend. There is nothing in this Act to indicate that fictitious or deceptive preticketing has Congressional approval.
 
 
 31
 It follows that the order of the Federal Trade Commission complained of by Petitioners is
 
 
 32
 Affirmed.